1   HATTON, PETRIE & STACKLER APC
    Attorneys at Law
2   20281 Birch Street, Suite 100
    Newport Beach, CA 92660
3   Telephone:  (949) 474-4222
    Facsimile (949) 474-1244
4
    GREGORY M. HATTON, CAL. BAR NO. 119810
5
    Attorneys for Plaintiff DAMERON HOSPITAL ASSOCIATION
6

7

8                  UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10                  SACRAMENTO DIVISION

11

12   _____
     )
13   DAMERON HOSPITAL            )
     ASSOCIATION, a Non-Profit   )
     California corporation,     )
14                               )   Civil Action File No.
                                 )
15              Plaintiff,       )
                                 )   COMPLAINT FOR
16         vs.                   )   JUDICIAL REVIEW OF
                                 )   ADMINISTRATIVE
17   Michael Leavitt, United States )  PROCEEDINGS
     Secretary of Health and Human )
18   Services,                   )
                                 )
19              Defendants.      )
     _____)
20

21                  **COMPLAINT**

22                     **I.**

23                  <u>**Jurisdiction**</u>:

24       1. This action is brought under Section 1878(f) of the Social Security

25   Act [42 U.S.C. 1395oo], and 42 CFR 405.1877.  Plaintiff seeks judicial review

26   of the final administrative decision of the Secretary of Health and Human

27   Services [Exhibit 1] reversing Decision 2006 D-16 in favor of plaintiff,

28   published by the Provider Reimbursement Review Board ("PRRB") of the

1  Center for Medicare and Medicaid Services ("CMS")  [Exhibit 2] in favor of

2  plaintiff.

3      2. This complaint is timely, in that it is filed within 60 days of the

4  aggrieved healthcare providers' receipt of the Secretary's final decision

5  [Exhibit 1].

6

7  **II.**

8  **Venue:**

9      3. Plaintiff is a corporation organized and existing under the laws of the

10  State of California with its principal office in Stockton, California, in the

11  Eastern District of California, nearest to the Sacramento Division.

12      4. Defendant is the Secretary of the United States Department of Health

13  and Human Services, duly appointed and qualified, and acting as the

14  administrative head of such agency and is responsible for its acts, including

15  the Decision of the CMS Administrator, Exhibit 1, and the attendant refusal of

16  the Department of Health and Human Services to reimburse plaintiff for

17  "Regular" Medicare Bad Debt ("RBD"), described below.

18      5. Venue of this action is laid in this district under the provision of

19  Section 1878(f)(1) of the Social Security Act [42 U.S.C. 1395oo].

20

21  **III.**

22  **Summary of Administrative Action and Itemization**

23  **of the Record Below:**

24      6. Plaintiff Dameron Hospital ("Dameron") is a general short-term provider

25  located in Stockton, California.  Plaintiff Dameron has 195 licensed beds.

26  Dameron's acute and HHA services were certified to participate in the Medicare

27  program on July 1, 1966.

28      7. As part of its regular administrative duties, CMS' Fiscal Intermediary

- 2 -

Dameron Hospital Association's Complaint<br>Case No.

1   audits, *inter alia,* health care providers' RMD reimbursement submissions.  The

2   Fiscal Intermediary's Report for plaintiff's Financial Year Ending 1999 ("FYE

3   '99") was issued July 22, 2003.  The Fiscal Intermediary's adjustment number 33

4   completely disallowed all of Plaintiff's FYE '99 RMD submissions.

5        8.  The amount of Medicare reimbursement in controversy for FYE '99 is

6   $38,000.  The Provider's calculation of the reimbursement is $64,220 X 0.60,

7   which is the bad debt reduction factor applicable to 1999.

8        9.  In January, 2004, Plaintiff Dameron timely appealed the Fiscal

9   Intermediary's RMD denial.  [42 CFR §§ 405.1835-1841]. Plaintiff Dameron

10  submitted Preliminary, Final, and Supplemental Final Position Papers.  The CMS

11  Fiscal Intermediary submitted a combined Preliminary and Final Position Paper,

12  and a Supplemental Final Position Paper.

13       10.  The PRRB heard the case in Baltimore, Maryland, on April 14, 2005.

14  The hearing was a live evidentiary proceeding with live testimony, documentary

15  evidence, and argument of counsel.

16       11.  At the hearing, the PRRB admitted Provider Exhibits P1 through P-36,

17  including subparts, without objection. Notably, exhibit P-36-5 is a grid

18  summarizing Dameron's extraordinary collection efforts in each of the 58 audited

19  accounts, which the Intermediary stipulated is accurate. Dameron also presented the

20  live testimony of its in-house Credit and Collections Department Manager.

21       12.  The PRRB also admitted Intermediary Exhibits I-1 through I-7, with

22  subparts, without objection.  The Intermediary presented the testimony of its Audit

23  Manager.

24       13.  York Stenographic Services prepared a 244 page transcript of the

25  hearing.

26       14.  On February 17, 2005, the PRRB published Decision 2006 D-16

27  [Exhibit 2], awarding plaintiff 100% of its RBD for FYE '99.

28       15.  On March 7, 2006, the CMS' Office of the Attorney Advisor faxed

Dameron Hospital Association's Complaint
Case No.

1   Notice of the Administrator's Review, *sua sponte*, to counsel for plaintiff Dameron

2   and for the Fiscal Intermediary, inviting comments.  [Exhibit 3.]

3       16.  On March 22, 2006, counsel for plaintiff Dameron timely faxed CMS'

4   Attorney Advisor the Provider's Comments on PRRB Decision 2006-D16.  [Copy,

5   Exhibit 4.]

6       17.  Additional timely comments were provided on behalf of the Fiscal

7   Intermediary and the Department of Health and Human Services (Director, Chronic

8   Care Policy Group, Center for Medicare Management).  [Exhibit 5.]

9       18.  On April 17, 2006 the CMS Administrator signed his Decision.

10  [Exhibit 1.]

11      19.  On April 19, 2006 the attorney advisor sent the Administrator's Decision

12  via certified mail to counsel for plaintiff Dameron, who received it on April 21,

13  2006.  [Exhibit 1.]

14

15                              **IV.**

16              **Exhaustion of Administrative Remedies:**

17      20.  The Secretary's decision concludes by stating:  "THIS

18  CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE

19  SECRETARY OF HEALTH AND HUMAN SERVICES."  Under Section

20  1878(f)(1) of the Social Security Act [42 U.S.C. 1395oo], plaintiff's only

21  remedy is "a civil action commenced within 60 days of the date on which

22  notice of any final decision ...by the Secretary is received."

23

24                               **V.**

25                      **Grounds for Relief:**

26      21.  On April 14, 2005, the PRRB held an evidentiary proceeding at

27  which it determined, based upon a preponderance of the evidence that:

28  *// // //*

1    a. Dameron was entitled to recover 100% of the FYE '99 RBD

2 submission at issue because, as a matter of fact and law, it had complied in full

3 with all four criteria mandating reimbursement of RBD, as set forth in 42 CFR

4 section 413.80(e).

5    b. As the result of plaintiff's extensive in-house collection activities,

6 RBD accounts are actually uncollectible, and valueless and therefore

7 reimbursable as a matter of fact and law at the time plaintiff Dameron assigns

8 its RBD accounts to an outside collection agency (along with all of plaintiff's

9 other collection accounts).

10    c. Plaintiff Dameron's RBD is reimbursable at the time it is submitted

11 to an outside collection agency for another reason, as well.  Plaintiff Dameron

12 met its burden of proving its right to write off and submit RBD in the manner

13 approved by the CMS Fiscal Intermediary prior to August 1, 1987, pursuant to

14 OBRA 1989 [section 6023 of the Omnibus Budget Reconciliation Act of

15 1989,  PUB. L. No. 101-239 (December 19, 1989)].

16    22. Acting pursuant to the express, statutory, and regulatory authority

17 delegated by the Secretary of Health and Human Services, the CMS

18 Administrator made errors of law and fact, and abused his discretion, by, *inter*

19 *alia*, reversing the PRRB, and holding that:

20    a. Plaintiff Dameron had not complied with 42 CFR section 413.80(e),

21 solely because some of the RBD patient accounts for FYE '99 resided at an

22 outside collection agency, instead at Dameron's in-house collections

23 department; and

24    b. The uncontested and uncontradicted sworn affidavit of plaintiff's

25 Chief Financial Officer (employed by plaintiff from well before August 1,

26 1987 to the present) was insufficient to meet plaintiff's burden of proof on an

27 issue squarely within the personal and professional knowledge of plaintiff's

28 CFO:  namely that, prior to August 1, 1987, the Fiscal Intermediary had

Dameron Hospital Association's Complaint
Case No.

1   approved for reimbursement RBD that plaintiff wrote off as bad debt at the

2   time plaintiff submitted the RBD to an outside collection agency.

3       23.  The Decision of the CMS Administrator is the final decision of the

4   Secretary of Health and Human Services, and, as such, the errors of fact and

5   law, and/or the abuse of discretion reflected therein are those of the Secretary.

6       24.  The CMS Administrator's Decision [Exhibit 1] not only supports

7   the unlawful denial of plaintiff's RBD FYE '99 submission.  It will also

8   provide the basis for the Fiscal Intermediary's continued unlawful denial of

9   plaintiff's RBD submission for FYE 2000, and for ensuing fiscal years.

10

11                              **VI.**

12                           **Standing**

13      25.  Plaintiff has suffered, and continues to suffer injury in fact:

14  namely, the denial of RBD reimbursement to plaintiff, which:

15      a.  Deprives plaintiff of money that it is due every year from the federal

16  government for treating Medicare beneficiaries; and

17      b.  Requires plaintiff to unlawfully cross-subsidize the individual patient

18  responsibility portion of charges incurred by Medicare beneficiaries for

19  medical goods and services reimbursable to plaintiff under applicable

20  Medicare statutes and regulations.

21

22                              **VII.**

23  **Count One:  Administrative Review, and Orders Vacating and**

24  **Remanding to the Administrator's Decision to the Secretary for Action**

25  **Consistent with the Law and Governing Regulations.**

26      26.  Plaintiff hereby incorporates paragraphs 1 through 25, Exhibits 1

27  through 5 attached hereto, and the record of administrative proceedings

28  described above, as though set forth in full at this point.

1    27.  This Court is empowered by statute and controlling federal

2    authority to review the record of the administrative agency action described

3    herein, and to issue orders to defendant Secretary, compelling the Secretary to

4    direct the CMS Administrator to revise and republish his decision [Exhibit 1]

5    so that it is consistent with the evidence at the administrative proceedings

6    below, consistent with the findings of fact by the trier of fact (the PRRB), and

7    consistent with the law.

8

9                                    **VIII.**

10                      **Count Two:  Declaratory Relief**

11   28.  Plaintiff hereby incorporates paragraphs 1 through 27, Exhibits 1

12   through 5 attached hereto, and the record of administrative proceedings, as

13   described above, as though set forth in full at this point.

14   29.  An actual controversy exists between the plaintiff, on the one hand,

15   and the Secretary of Health and Human Services on the other, entitling

16   plaintiff to a declaration of the respective rights and liability of the parties in

17   regard to the matters at issue herein.

18

19                                    **VII.**

20                      **Count Three:  Injunctive Relief**

21   30.  Plaintiff hereby incorporates paragraphs 1 through 29, and Exhibits

22   1 through 5, and the record below, as described above, as though set forth in

23   full at this point.

24   31.  This Court has discretion to order Secretary to reimburse plaintiff in

25   full for its FYE '99 RBD submission, and to order the Secretary to adopt

26   PRRB Decision 2006 D16 [Exhibit 2] as the Decision of the CMS

27   Administrator, in place and instead of the Decision attached hereto as Exhibit

28   1.  Good cause exists for such an order, in that the CMS Administrator, acting

1   on behalf of the Secretary, has denied plaintiff's FYE '99 RBD submission in

2   its entirety in violation of the law and in direct contradiction of factual

3   findings by the only trier of fact in these proceedings, the PRRB.  As such, the

4   Secretary, acting through the CMS Administrator, has disregarded controlling

5   fact and law and/or abused his discretion in reversing PRRB Decision 2006 D-

6   16.  Plaintiff Dameron suffers, and will continue to suffer irreparable harm as

7   a result of the Administrator's unlawful reversal of PRRB Decision 2006 D-

8   16, in that the Fiscal Intermediary is presently relying on the Administrator's

9   Decision [Exhibit 1] to deny plaintiff Dameron's legally reimbursable RMD

10  for fiscal years subsequent to FYE '99, as well.

11

12                                          **VII.**

13                    **Count Four:  Administrative Mandamus**

14         32.  Plaintiff hereby incorporates paragraphs 1 through 31, Exhibits 1

15  through 5 attached hereto, and the record of the administrative proceedings,

16  described above, as though set forth in full at this point.

17         33.  Plaintiff is informed and believes, and alleges thereon, that the

18  Secretary, acting through the CMS Administrator, has embarked on an

19  unlawful campaign to deny RBD reimbursements throughout the United

20  States, based upon unreasonable interpretations of the law and controlling

21  regulations, resulting the denial of RBD reimbursement submissions that meet

22  all four requirements of 42 CFR section 413.80(e).  Accordingly, the

23  following orders of mandamus are appropriate:

24         a.  The Secretary shall not deny RBD reimbursement on any Medicare

25  beneficiary's account that meets all four requirements of 42 CFR section

26  413.80(e), based solely on the fact that an otherwise valueless and

27  uncollectible RBD account resides with an outside collection agency, instead

28  of with the health care provider; and

1     b. The Secretary shall not require a health care provider seeking RBD

2   reimbursement to meet a burden of proof other than a preponderance of the

3   evidence in establishing the right to submit RBD accounts for reimbursement

4   in the manner allowed under OBRA 1989 [section 6023 of the Omnibus

5   Budget Reconciliation Act of 1989,  PUB. L. No. 101-239 (December 19,

6   1989)].

7

8                              **IX.**

9                      **Prayer for Relief**

10     Wherefore, plaintiff prays for:

11     1. Orders vacating the Administrator's Decision [Exhibit 1] and

12   remanding it to the Secretary of Health and Human Services, and instructing

13   the Secretary to direct the CMS Administrator to revise and republish his

14   Decision in a manner consistent with the evidentiary record of administrative

15   proceedings below, the findings of fact by the PRRB, and with the law.

16     2. A declaration of the respective rights and liabilities of the parties in

17   regard to the matters at issue herein.

18     3. An order that the Secretary of Health and Human Services reimburse

19   plaintiff in full, in the amount required by law, for its FYE '99 RBD

20   submission, and directing the Secretary to adopt PRRB Decision 2006 D-16

21   [Exhibit 2], in place and instead of the CMS Administrator's Decision [Exhibit

22   1].

23     4. Orders of Administrative Mandamus that:

24     a. The Secretary shall not deny RBD reimbursement on any Medicare

25   beneficiary's account that meets all four requirements of 42 CFR section

26   413.80(e), based solely on the fact that an otherwise valueless and

27   uncollectible RBD account resides with an outside collection agency, instead

28   of with the health care provider; and

Dameron Hospital Association's Complaint
Case No.

1       b.  The Secretary shall not require a health care provider seeking RBD

2  reimbursement to meet a burden of proof other than a preponderance of the

3  evidence in establishing the right to submit RBD accounts for reimbursement

4  in the manner allowed under OBRA 1989 [section 6023 of the Omnibus

5  Budget Reconciliation Act of 1989,  PUB. L. No. 101-239 (December 19,

6  1989)].

7       5.  For costs and such other relief as the court may deem proper.

8

9  Dated:  June 19, 2006

10                              HATTON, PETRIE & STACKLER

11

12                              By:_____

13                              Gregory M. Hatton
                            Attorneys for Dameron Hospital Association

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 10 -

# EXHIBIT 1

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

APR 1 9 2006

**VIA CERTIFIED MAIL**

Gregory Hatton, Esquire
Hatton, Petrie & Stackler
20311 Birch Street
Newport Beach, CA 92660

Re:  Dameron Hospital, PRRB Decision No. 2006-D16

Dear Mr. Hatton:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board.  This constitutes the final administrative decision of the

Secretary of the Health and Human Services.  Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc:  James R. Grimes, Esquire, Intermediary's Representative

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| Dameron Hospital | Provider Cost Reimbursement Determination for Cost Reporting P eriod Ending: 12/31/99 |
| Provider | |
| vs. | |
| Blue Cross Blue Shield Association/ United Government Services, LLC | Review of: |
| | PRRB Dec. No. 2006-D16 Dated: February 17, 2006 |
| Intermediary | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the Provider Reimbursement Review Board decision number 2006-D16. The review is during the 60-day period in Section 1878(f)(1) of the Social Security Act (Act), as amended (42 USC 139500(f)). Comments were received from CMS' Center for Medicare Management (CMM) and the Intermediary both requesting reversal of the Board's decision. The parties were then notified of the Administrator's intention to review the Board's decision. The Provider also submitted comments, requesting that the Administrator affirm the Board's decision. All comments were timely received. Accordingly, this case is now before the Administrator for final administrative review.

## ISSUE AND BOARD DECISION

The issue before the Administrator is whether the Intermediary's disallowance of the Provider's inpatient and outpatient Medicare bad debts was proper.

The Board held that the Intermediary's adjustment disallowing Medicare bad debts due to inadequate collection efforts was improper. The Board found that the Intermediary disallowed the Provider's bad debts because the Provider failed to comply with the requirements of the regulation at 42 CFR §413.80 that sets forth certain criteria providers must meet for reimbursement. The Board stated that the

4,17,06

Intermediary's sole basis for the disallowance was the Provider's use of an outside collection agency as part of its collection efforts. The Board noted the Intermediary's argument that the Provider was not entitled to claim Medicare reimbursement for any bad debt until such time that the collection agency ceased its collection activities and returned the account to the Provider. However, the Board found that the Intermediary's argument is contrary to Section 310.2 of the Provider Reimbursement Manual (PRM) which permits a provider to claim Medicare bad debts for accounts that remain uncollected after a provider has engaged in reasonable and customary collection efforts for a period of at least 120 days.

The Board noted that pursuant to Section 310.2 of the PRM, a provider's use of a collection agency may be "in addition to or in lieu of" collection efforts undertaken by the Provider itself. Thus, the Board found that the Intermediary's argument that the Provider's use of an external collection agency obligated the Provider to engage in its collection efforts for a period greater than the 120 day criterion is not supported by the applicable Medicare regulations or manual instructions.

The Board also noted that the mere "active" status of an account with an outside collection agency, while suggestive of collectibility of that account, is not in and of itself proof of value or collectibility. Therefore, an account that is actually worthless and uncollectible could languish as an "open" or "active" account in an outside collection agency indefinitely. Consequently, the Board reasoned that this is why neither the 120-day presumption of uncollectibility in the PRM, nor the presumption of collectibility of collection agency accounts in the Intermediary Manual, can operate as conclusive presumption, and that the four criteria in 42 C.F.R. §413.80(e) must control.

The Board also held that the Intermediary's present rejection of the Provider's bad debt policy, after having repeatedly accepted it for prior years, was statutorily barred, pursuant to §6023 of the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239(Dec. 19, 1989). The Board found that beginning with the FYE 1999 audit, the Intermediary for the first time rejected bad debt submissions on accounts that remained "active" with an outside agency. The Intermediary, applying program rules in effect on August 1, 1987 with respect to collection agency referrals, accepted the Provider's bad debt collection policy before that date. Pursuant to section 6023 of OBRA, the Board held that the Intermediary cannot now apply the same rules to declare the policy unacceptable and require the Provider to change this bad debt collection policy. Thus, under the law, regulations and program instruction, the Board found that Provider is entitled to Medicare reimbursement for the bad debts at issue in this case.

## SUMMARY OF COMMENTS

CMM commented, requesting reversal of the Board's decision. CMM argued that in order for bad debts to be reimbursable cost under Medicare, they must meet the criteria set forth in 42 CFR §413.80 and the requirements in the PRM.

CMM noted that Section 310.2 of the PRM provides specific guidelines regarding the noncollectibility of bad debts. Specifically, section 310.2 of the PRM states, [I]f after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible." CMM argued that Medicare's intent has always been that section 310.2 of the PRM be read within the context of the bad debt policy as set forth at sections 308 and 310 of the PRM. That is, until a provider's reasonable collection effort has been completed, including both in-house efforts and the use of a collection agency, a Medicare bad debt may not be reimbursed as uncollectible. CMM noted, that based on the relevant facts, the Provider's claimed bad debts were still active accounts held by the collection agency, were not yet deemed worthless or uncollectible, and not eligible to be claimed as reimbursable bad debts. Thus, CMM concluded that the Provider did not meet the reasonable collection effort requirements in the regulations or manual instruction.

CMM commented that pursuant to §6023 of the Omnibus Budget Reconciliation Act, when Intermediaries change and the first Intermediary, prior to August 1, 1987, allowed a hospital's bad debts for accounts sent to a collection agency, Medicare will permit that Intermediary to continue to allow the bad debts. However, CMM argued that, if the new Intermediary's position is to disallow the hospital's bad debts for accounts sent to a collection agency consistent with Medicare policy, Medicare expects it to disallow the bad debts after it becomes the hospital's Intermediary. Accordingly, UGS, the Provider's Intermediary since 1999, should disallow the Provider's bad debts for accounts sent to a collection agency until the collection agency has completed its collection effort and returned the uncollected accounts to the Provider.

The Intermediary, commented requesting reversal of the Board's decision. The Intermediary argued that under Medicare rules, including CMS instruction, the Provider's Medicare accounts at an outside collection agency could not be deemed worthless and uncollectible until the agency activity has stopped and the accounts returned to the Provider. Accordingly, if the accounts are not determined to be worthless and uncollectible, they cannot be considered as bad debts for cost reporting purposes. The Intermediary argued that the Board was in error, when it held that the Medicare regulations, program instructions and CMS memorandums did not establish any presumption that accounts assigned to an outside collection

agency should be considered to have value because collection efforts continue. Thus, the Intermediary contended that the Board's reasoning in this case violated the regulations and program instructions, and should be reversed.

The Provider, commented requesting affirmation of the Board's decision. The Provider argued that, pursuant to a presumption set forth in section 310.2 of the PRM, it should receive reimbursement. The Provider claimed that it engaged in reasonable collection efforts for 120 days before claiming the amounts as bad debts. The Provider pointed out that the Intermediary Manual provision relied on by the Intermediary conflicts with the PRM presumption that the Medicare program expects providers to continue to pursue collection efforts, even after they deem bad debts uncollectible. In addition, application of the Intermediary Manual provision would adversely affect providers who diligently engage in reasonable collection efforts. The fact that some accounts resided at an outside agency at the time of the FYE 1999 audit cannot overcome the overwhelming evidence that each of the accounts are now, and were "actually uncollectible when claimed as worthless," and without any "likelihood of recovery in the future."

Further, the Provider argued that, although they have a right to reimbursement without reliance on OBRA 1989, that law renders the Intermediary's reliance on Part IB 13-2 of the MIM and the presumption of collectibility inapplicable here. The Provider notes that prior to August 1987, the fiscal Intermediary accepted its practice of writing off bad debt, and submitting it for regular bad debt reimbursement at or about the time of assignment to an outside collection agency.

Finally, the Provider noted that the in-house collections department personalizes its collection efforts to respond to the facts and circumstances that are understandably unique in each collection account. These personalized efforts are the model of thoroughness and consistency in Medicare and non-Medicare accounts alike, because they focus on the factors that maximize collections in each account. Thus, the Provider concluded that, pursuant to the plain language of the regulations and Provider Reimbursement Manual, it is entitled to Medicare reimbursement for its claimed bad debts.

## DISCUSSION

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments timely received have been included in the record and considered.

Section 1861(v)(1)(A) of the Social Security Act requires that providers of services to Medicare beneficiaries are to be reimbursed the reasonable cost of those services. Reasonable cost is defined as the "the cost actually incurred, excluding therefrom part of the incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included ..." Id. This section does not specifically address the determination of reasonable cost, but authorizes the Secretary to promulgate regulations and principles to be applied in determining reasonable costs.  One of the underlying principles set forth in the Act is that Medicare shall not pay for costs incurred by non-Medicare beneficiaries, and vice-versa, i.e., Medicare prohibits cross-subsidization of costs.

These principles are reflected and further explained in the regulations.  The regulations at 42 CFR §413.9(c) provides that the determination of reasonable cost must be based on costs related to the care of Medicare beneficiaries.  However, if a provider's costs include amounts not reimbursable under the program, those costs will not be reimbursable.

Relevant to this case, the regulation at 42 CFR §413.80(a) specifically provides that bad debts are reductions in revenues and are not included in allowable costs. However, the regulation at 42 CFR §413.80(a) further provides that bad debts attributable to the deductible and coinsurance amounts of Medicare beneficiaries are reimbursed under the Medicare program. [1]  Bad debts are defined at 42 CFR §413.80(b)(1) as:

> [A]mounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future. [2]

The regulation at 42 CFR § 413.80(d) states that payment for deductibles and coinsurance amounts are the responsibility of the beneficiaries.  However, recognizing the reasonable costs principle at Section 1861(v)(1)(A) of the Act which prohibits cross subsidization, the program states that the inability of providers to collect deductibles and coinsurance amounts from the Medicare beneficiaries could result in part of the costs of Medicare covered services being borne by individuals

---

[1] See also, Section 304 of PRM.

[2] See also, Section 302 of the PRM.

who are not beneficiaries. Therefore, to prevent such cross-subsidization, Medicare reimburses providers for allowable bad debts.[3]

Consequently, Providers may receive reimbursement for Medicare bad debt, if they meet all of the criteria set forth in 42 CFR §413.80(e):

> A bad debt must meet the following criteria to be allowable:
>
> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.
> (2) The provider must be able to establish that reasonable collection efforts were made.
> (3) The debt was actually uncollectible when claimed as worthless.
> (4) Sound business judgment established that there was no likelihood of recovery at any time in the future.[4] (Emphasis added).

Under the Secretary's interpretive authority, the Provider Reimbursement Manual (PRM) has been issued, which clarifies the reimbursement regulations. Relevant to the issue in this case, Section 310 of the Manual states:

> To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non- Medicare patients.

Section 310.A of the Manual further explains:

> A provider's collection effort may include the use of a collection agency in addition to or in lieu of subsequent billings, follow-up letters, telephone and personal contacts. Where a collection agency is used, Medicare expects the provider to refer all uncollected patient charges of like amount to the agency without regard to class of patient. The "like amount" requirement may include uncollected charges above a specified minimum amount. Therefore, if a provider refers to a collection agency its uncollected non-Medicare patient charges, which in amount are comparable to the individual Medicare deductible and coinsurance amounts due the provider from its Medicare patient,

---

[3] See Id.

[4] See also Section 308 of the PRM.

> Medicare requires the provider to also refer its uncollected Medicare
> deductible and coinsurance amounts to the collection agency.

Further, in elaboration on the concept of reasonable collection effort, section 310.2
of PRM, provides:

> If after reasonable and customary attempts to collect a bill, the debt
> remains unpaid more than 120 days from the date the first bill is mailed
> to the beneficiary, the debt may be deemed uncollectible.

Section 314 of the PRM states that uncollectible deductibles and coinsurance
amounts are recognized as allowable bad debts in the reporting period in which such
debts are determined to be worthless and non-collectible[5]. This instruction also
explains the burden of the Provider to thoroughly document its claimed bad debts:

> Since bad debts are uncollectible accounts…the Provider should have
> the usual accounts receivable records-ledger cards and source
> documents to support its claim…for each account included. Examples
> of the information that may be retained include…date of bills…date of
> write off.

Moreover, to ensure that Providers receive reimbursement for services they actually
furnish, the Secretary has implemented a number of Medicare documentation
regulations at 42 CFR §§413.9, 413.20 and 413.24. Consistent with the
documentation regulations and relevant to Medicare bad debts, section 310.B of
PRM provides:

> Documentation Required. -- The provider's collection effort should be
> documented in the patient's file by copies of the bill(s), follow-up
> letters, reports of telephone and personal contact, etc.

Consistent with the Act, the Secretary has also issued guidelines for an intermediary
to follow when auditing cost reports. The Intermediary Manual explains that
Medicare bad debts for deductible and coinsurance are reimbursed as a pass-through
cost. Since they have a direct dollar for dollar effect on reimbursement, there is an
incentive to claim bad debts before they become worthless.

This instruction also discusses both reliance on a collection agency may occur and
the kind of documentation in which the Provider should engage to support a
conclusion of a reasonable collection effort. Specifically, the instruction states that:

> If the bad debt is written-off on the provider's books 121 days after the date of the bill and then turned over to a collection agency, the amount cannot be claimed as a Medicare bad debt on the date of the write-off. It can be claimed as a Medicare bad debt only after the collection agency completes its collection effort.[6]

As cited above, a provider is entitled to bad debts arising from Medicare coinsurance and deductibles. In order to be reimbursed for such bad debts, a provider must meet certain criteria.    In demonstrating that the criteria have been met, among other things, a provider must show that debts are actually uncollectible when claimed as worthless and sound business judgment established no likelihood of recovery in the future.

Further, the statutory moratorium enacted by section 4008(c) of OBRA of 1987 prohibited the Secretary from making any changes in policies that were in effect on August 1, 1987 regarding reimbursement of bad debts, including the criteria of what constitutes a bad debt. Subsequently, this provision was amended by section 8402 of the Technical and Miscellaneous Revenue Act of 1988[7] and section 6023 of OBRA of 1989,[8] to provide that:

> The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a chance in the hospital's collection policy.  (Emphasis added.)

The Conference Report to the Technical and Miscellaneous Revenue Act of 1988 states that in order for the moratorium to apply, the intermediary must affirmatively approve a provider's policy and that such acceptance cannot be inconsistent with the regulations and program instructions. The Report states:

---

[6] Intermediary Manual, Part IB, 13-2.

[7] Pub. L. No. 100-647.

[8] Pub. L. No. 101-239.

> The conferees wish to clarify that the Congress intended the actions of fiscal intermediaries occurring prior to August 1, 1987 to <u>approve explicitly</u> hospital's bad debt collection practices, to the extent such action by the fiscal intermediary was consistent with the regulations, PRRB decisions, or program manuals and issuances, are to be considered an integral part of the policy in effect on that date, and thus not subject to change.

> However, <u>the conferees do not intend to preclude the Secretary from disallowing bad debt payments based on regulations, PRRB decision, manuals and issuance is [sic]</u> in effect prior to August 1, 1987.[9]

In this case, the record reflects that the Provider generally had engaged in in-house collection efforts for a certain period of time and then turned accounts over to a collection agency. The Provider then wrote-off the debts for financial purposes.[10] On audit, the Intermediary disallowed the claimed bad debts and determined that the Provider failed to demonstrate that the debts in question were uncollectible when claimed as worthless and that there was no likelihood of recovery in the future.

Applying the foregoing provisions of Act, the regulations and instructions to the facts in this case, the Administrator finds that the Intermediary properly determined that Medicare could not reimburse the bad debts claimed by the Provider. In this instance, the Provider did not establish that the accounts were "actually uncollectible" when claimed as worthless or that "sound business judgment" established that there was no likelihood of recovery at any time in the future.

The Administrator recognizes that section 310.2 of the PRM permits a debt unpaid for more than 120 days from the date the first bill is mailed to the beneficiary to be deemed uncollectible. However, the Administrator notes that the language of that section implies discretionary rather than mandatory application of the presumption, i.e., the debt "may" rather than "shall" be deemed uncollectible. That manual section does not suggest that this presumption relieves the Provider from meeting the general regulatory documentation requirements or the specific documentation

---

[9] H.R. Rep. No. 1104, 100th Cong., 2d Sess 277 (1988), <u>reprinted in</u> 1988 U.S. Code & Cong. Ad. News at 5337. (Emphasis added.)

[10] <u>See</u> Transcript of Oral Hearing (Tr.) held April 14, 2005, pp. 14-24. However, the record and testimony is unclear as to exact time period the Provider engaged in in-house collection efforts and when accounts were forwarded to the collection agency.

requirements in sections 310.B and 314 of the PRM. Thus, the presumption only applies where a provider has otherwise demonstrated through appropriate documentation that it engaged in reasonable collection efforts.

Further, the Administrator notes the Provider's argument that application of the cited Intermediary Manual provision would adversely affect providers who diligently engage in reasonable collection. However, as the agency explained, since Medicare bad debts have a direct dollar for dollar effect on reimbursement, there is an incentive to claim bad debts before they become worthless. If a provider continues to attempt collection of a debt, either through in-house or a collection agency, it is reasonable to conclude that the provider still considers that debt to have value and not worthless. Thus, contrary to the Provider's argument, the Administrator finds it reasonable to expect a provider to demonstrate that it has completed its collection effort, including outside collection, before claiming debts as worthless.

The Administrator also notes that section 316 of PRM provides only an instruction, in the event that a Medicare bad debt is subsequently recovered, for reporting such revenue and its reimbursement effect. This is a provision to prevent double dipping by the Provider at the expense of the Program. The Administrator finds that the language of the manual section in no way infers that the Medicare program expects, or even anticipates, providers to continue to pursue collection activities after claiming Medicare bad debts on their cost reports. Thereby, if a provider deems a debt uncollectible after reasonable collection efforts, and, thus worthless, a provider would not be expected to pursue further collection activities. However, if a provider does continue to pursue collection activities, clearly it does not believe the debt to be worthless

Finally, the Administrator disagrees with the Board's conclusion that, pursuant to the language of section 6023 of the Omnibus Budget Reconciliation Act of 1989, the Intermediary's present rejection of the Provider's bad debt policy is statutorily barred. In this case, the record fails to show that the Intermediary "accepted" the Provider's policy (or procedures or practice) within the meaning of the moratorium. As the legislative history makes clear, an intermediary must explicitly approve a provider's policy in order for the moratorium to apply.[11] In this case, the record does not demonstrate an explicit approval by the Intermediary of the Provider's bad debt policy and practices.

_____

[11] See H.R. Rep. No. 1104, 100th Cong., 2d Sess 277 (1988), reprinted in 1988 U.S. Code & Cong. Ad. News at 5337. See e.g., Hennepin County Medical Center v. Shalala, 81 F.3d 743 (8th Cir. 1996); University Health Services, Inc. v. Shalala, 120 F.3[rd] 1145 (1997).

11

The Administrator finds that the Provider submitted the Statements of the CFO and a print-out of the bad debt policy, dated after August 1, 1987. However, these documents do not demonstrate explicit approval by the Intermediary. The Administrator also notes the Provider's argument that it would have had to keep records an inordinate amount of time. However, regardless of recordkeeping requirements, under administrative law, the proponent of the rule has the burden of proof. 5 USC 556(d). In this instance, the Provider has the burden of proof to support its claim for bad debts by a preponderance of the evidence.

In addition, the Medicare statute provides that at Section 1815 of the Act that:

> [N]o such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid ...

Consequently, the Administrator finds that it is the Provider's burden to demonstrate that the Intermediary explicitly approved its bad debt policy prior to August 1, 1987 for the moratorium to be applied. As the Provider has not demonstratated such explicit approval by the Intermediary of the Provider's bad debt policy prior to August 1, 1987, the Intermediary's disallowance in this case is not barred by the moratorium.

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF
THE SECRETARY OF HEALTH AND HUMAN SERVICES.

Date: 4/17/06

Leslie V. Norwalk, Esq.
Deputy Administrator
Centers for Medicare & Medicaid Services

# EXHIBIT 2

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

2006-D16

| | |
|---|---|
| **PROVIDER** –<br>Dameron Hospital<br>Stockton, CA | **DATE OF HEARING** -<br>April 14, 2005 |
| Provider No.: 05-0122 | Cost Reporting Period Ended -<br>December 31, 1999 |
| **vs.** | |
| **INTERMEDIARY** –<br>Blue Cross Blue Shield Association/<br>United Government Services, LLC | **CASE NO.:** 04-0426 |

## INDEX

| | Page No. |
|---|---|
| Issue.................................................................................................................. | 2 |
| Medicare Statutory and Regulatory Background......................................... | 2 |
| Statement of the Case and Procedural History........................................... | 2 |
| Provider's Contentions................................................................................. | 3 |
| Intermediary's Contentions.......................................................................... | 4 |
| Findings of Fact, Conclusions of Law and Discussion............................. | 5 |
| Decision and Order...................................................................................... | 12 |

2.17

Page 2                                                                CN: 04-0426

ISSUE:

Whether the Intermediary's disallowance of the Provider's inpatient and outpatient
Medicare bad debts was proper.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the proper amount of Medicare reimbursement due a provider of
medical services.

The Medicare program was established to provide health insurance to the aged and
disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services
(CMS), formerly the Health Care Financing Administration (HCFA), is the operating
component of the Department of Health and Human Services (DHHS) charged with
administering the Medicare program. CMS' payment and audit functions under the
Medicare program are contracted out to insurance companies known as fiscal
intermediaries. Fiscal intermediaries determine payment amounts due the providers
under Medicare law and under interpretive guidelines published by CMS. See, 42 U.S.C.
§1395(h), 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal
intermediary showing the costs it incurred during the fiscal year and the proportion of
those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary
reviews the cost report, determines the total amount of Medicare reimbursement due the
provider and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R.
§405.1803. A provider dissatisfied with the intermediary's final determination of total
reimbursement may file an appeal with the Provider Reimbursement Review Board
(Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R.
§405.1835.

Under the Medicare statute, a provider is entitled to claim as a reimbursable cost "bad
debts" attributable to amounts unpaid by beneficiaries for Medicare deductibles and
coinsurance for the Medicare patients it services. 42 C.F.R. §413.80. This appeal
involves the Intermediary's denial of the Provider's bad debt claim.

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Dameron Hospital (Provider) is a 195 bed, general short-term hospital located in
Stockton, California. The Provider was certified to participate in the Medicare program
on July 1, 1966.

For fiscal year ended (FYE) 12/31/99 the Provider claimed $64,000 in bad debts on its
cost report based upon its debt collection polices and its actual collection activities
throughout the fiscal year. The Provider's collection and write-off policies had been
reviewed and accepted by its Intermediaries during audits of prior periods. In 1999,
United Government Services (Intermediary) became the Provider's intermediary and

conducted its first audit of the Provider's debt collection policies/activities. The audit
indicated that the Provider deemed its accounts uncollectible when it exhausted its in-
house attempts to collect them. Subsequent to those write-offs, the Provider sent its
uncollectible accounts to an outside agency for a last effort to effect collection. The
Intermediary disputed the propriety of identifying those accounts forwarded to the
outside agency as uncollectible and disallowed the amount of the write-off in total. There
is no dispute that 42 C.F.R. §413.80 and Provider Reimbursement Manual (PRM) 15-1,
sections 308 and 310 are the controlling guidance for bad debts. The dispute centers on
the appropriate time to identify an account as uncollectible and write it off as a bad debt.

The Provider timely appealed to the Board pursuant to 42 C.F.R. §§405.1835-.1841 and
has met the jurisdictional requirements of those regulations. The amount of Medicare
reimbursement in controversy is $38,000. The Provider was represented by Gregory M.
Hatton, Esquire. The Intermediary was represented by James Grimes, Esquire, of Blue
Cross and Blue Shield Association.

PROVIDER'S CONTENTIONS:

For FYE 1999 the Intermediary audited 58 of 142 accounts that the Provider submitted to
Medicare for bad debt reimbursement. Based on the audit of the 58 accounts, the
Intermediary denied all 142 bad debt submissions on the FYE 1999 cost report. The
Provider argues that the Intermediary's denial must be reversed in its entirety for the
following reasons:

1.) The Intermediary misinterprets applicable law and regulation. As to each of
the audited accounts, the Provider's sound business judgment establishes that,
at the time the account was written off to bad debt, there was no likelihood of
recovery at any time in the future.

2.) The Intermediary fails to comprehend the collection policies and procedures
followed by the Provider that are relevant here. The Provider exhausts
extensive collection efforts before concluding that any Medicare patient
account is actually uncollectible and worthless.

3.) The Intermediary evidently failed to comprehend the Provider's detailed
documentation of relevant collection efforts on the 58 audited accounts. These
collection efforts provide the basis for the Provider's sound business judgment
that there was no likelihood of recovery at any time in the future.

4.) Neither of the competing presumptions regarding collectibility in the Program
Instructions apply here. The PRM, section 310.2, permits a debt unpaid for
more than 120 days from the first billing of the beneficiary to be deemed
*uncollectible*. A countervailing presumption is found in the Medicare
Intermediary Manual (MIM). Part IB, 13-2 of the MIM includes the
presumption that any account that remains on "active" or "open" status with
the Provider's outside collection agency has "value" and is therefore

*collectible.* Neither the presumption of *collectibility* in the PRM, nor the presumption of *uncollectibility* in the MIM are conclusive. And where, as here, the provider satisfies all four of the criteria in C.F.R. §413.80(e), *neither* presumption applies.[1]

5.) The Provider's documentation of its activity is detailed and adequate. As to each of the 58 accounts, the Provider's documentation supports the conclusion that: (a) "Sound business judgment establishes that there was no likelihood of recovery at any time in the future;" and (b) The debts were "actually uncollectible when claimed as worthless." Failure to reimburse the bad debts violates the prohibition on cross-subsidization; Social Security Act Section 1861(v)(1)(A); and bad debt reimbursement regulations. C.F.R. §413.80(d) and (e).

6.) Finally, the Provider contends that the Intermediary violated section 6023 of the Omnibus Budget Reconciliation Act of 1989 (OBRA). The Intermediary disallowed the Provider's bad debt claims because the accounts were still listed as "active" by the Provider's outside collection agency years after the Provider assigned the accounts. Prior to August 1987, and until the FYE 1999 audit, the Intermediary had accepted the Provider's collection policy and procedure, whereby the Provider wrote off patient accounts as bad debts at or about the time that the accounts were assigned to an outside agency. Under OBRA, the Intermediary must continue to accept this policy.

## INTERMEDIARY'S CONTENTIONS:

The Intermediary selected a sample of 58 regular Medicare bad debt accounts to review for compliance with PRM 15-1 sections 308 and 310. The following were the auditor's findings:

1.) "The FI requested the Provider to furnish documentation to support that all regular bad debts claimed were deemed worthless/uncollectible in FY 1999. The Provider furnished a report, which was generated by the collection agency. Based on the review of sampled accounts' collection history, the FI found that all of them were still active in 1999. Medicare accounts at a collection agency are not deemed worthless/uncollectible until the collection agency stopped active

---

[1] Methodist Hospital of Dyesburg v. Blue Cross and Blue Shield, PRRB Case No. 96-1215, Decision No. 00-D56; : Lourdes Hospital v. AdminaStar of Kentucky, PRRB Dec. Nos. 95-D58, 95- D59, 95-D60, Medicare and Medicaid Guide (CCH) ¶43,585 (1995); King's Daughters' Hospital v. Blue Cross and Blue Shield of Kentucky, PRRB Dec. No. 91-D5, Medicare and Medicaid Guide (CCH) ¶38,950 (1990); St. Francis Hospital and Medical Center v. Kansas Hospital Service Assn., PRRB Dec. No. 86-D21, Medicare and Medicaid Guide (CCH) ¶35,302(1985), and Scotland Memorial Hospital v. Blue Cross and Blue Shield Association of North Carolina, PRRB Dec. No. 84-D174, Medicare and Medicaid Guide (CCH) ¶34,225 (1984).

Page 5                                                                        CN: 04-0426

collection efforts."

2.) "Collection efforts were not consistent with all payer types."

3.) "The Provider did not follow its own in-house collection policies and producers [sic] [procedures]."

Based on the above findings, the Intermediary disallowed all regular Medicare inpatient and outpatient bad debts. The Intermediary contended that Provider failed to comply with the applicable Medicare regulations and manual sections pertaining to bad debt collections because it was still pursuing collection efforts for its Medicare bad debts by using an external collection agency.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

The Board, after consideration of Medicare law and guidelines, the parties' contentions and the evidence contained in the record, finds and concludes that the Intermediary's adjustments to the Provider's bad debts were improper. The Provider's bad debts are allowable.

42 C.F.R. §413.80(a) provides that bad debts attributable to the deductible and coinsurance amounts of Medicare beneficiaries are reimbursed under the Medicare program. Bad debts are defined at 42 C.F.R. §413.80(b)(1) as:

> [A]mounts considered to be uncollectible from accounts and notes receivable that were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the furnishing of services, and are collectible in money in the relatively near future.

The regulation at 42 C.F.R. §413.80(d) states that payment for deductibles and coinsurance amounts is the responsibility of the beneficiaries. However, recognizing the reasonable cost principle at Section 1861(v)(1)(A) of the Social Security Act, which prohibits cross-subsidization, the program states that the inability of providers to collect deductibles and coinsurance amounts from Medicare beneficiaries could result in part of the costs of Medicare covered services being borne by individuals who are not beneficiaries. Therefore, to prevent such cross-subsidization, Medicare reimburses providers for allowable bad debts.

Providers may receive reimbursement for Medicare bad debt if they meet all of the criteria set forth in 42 C.F.R. §413.80(e). The criteria require that:

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The Provider must be able to establish that reasonable collection efforts were made.

30

CN: 04-0426

> (3) The debt was actually uncollectible when claimed as worthless.
>
> (4) Sound business judgment established that there was no likelihood of
>     recovery at any time in the future.

PRM 15-1 Section 310 states:

> To be considered a reasonable collection effort, a provider's effort to
> collect Medicare deductible and coinsurance amounts must be similar
> to the effort the provider puts forth to collect comparable amounts from
> non-Medicare patients.

Section 310.A of the PRM further explains:

> A provider's collection effort may include the use of a collection
> agency in addition to or in lieu of subsequent billings, follow-up letters,
> telephone and personal contacts. Where a collection agency is used,
> Medicare expects the provider to refer all uncollected patient charges of
> like amount to the agency without regard to class of patient. The "like
> amount" requirement may include uncollected charges above a
> specified minimum amount. Therefore, if a provider refers to a
> collection agency its uncollected non-Medicare patient charges which
> in amount are comparable to the individual Medicare deductible and
> coinsurance amounts due the provider from its Medicare patient,
> Medicare requires the provider to also refer its uncollected Medicare
> deductible and coinsurance amounts to the collection agency. . . .

The evidence establishes that the Provider's collection efforts on Medicare accounts not
only meet the Provider's collection efforts on non-Medicare accounts but also exceed
those efforts in one critical regard. The Provider, through an agreement with its outside
collection agency, forwards Medicare accounts to outside collections when: (1) They are
actually uncollectible; and (2) in the sound business judgment of the Provider, there is no
likelihood of recovery at any time in the future.

Section 310.2 of the PRM provides:

> If after reasonable and customary attempts to collect a bill, the debt
> remains unpaid more than 120 days from the date the first bill is mailed
> to the beneficiary, the debt may be deemed uncollectible.

The Provider does not rely on the "120-day presumption" in declaring the accounts
worthless. Rather, it relies on its sound business judgment on each individual account.[2]
Section 314 of the PRM states that uncollectible deductibles and coinsurance amounts are
recognized as allowable bad debts in the cost reporting period in which such debts are

---

[2] P35.

CN: 04-0426

determined to be worthless and non-collectible. This instruction also places the burden
on the Provider to thoroughly document its claimed bad debts:

> . . . Since bad debts are uncollectible accounts . . . the provider should
> have the usual accounts receivable records-ledger cards and source
> documents to support its claim . . . for each account included.
> Examples of the information that may be retained include . . . date of
> bills . . . date of write off . . .

Moreover, to ensure that providers receive reimbursement for services they actually
furnish, the Secretary has implemented a number of Medicare documentation regulations
at 42 C.F.R. §§413.9, 413.20 and 413.24. Consistent with the documentation regulations
and relevant to Medicare bad debts, section 310.B of the PRM provides:

> Documentation Required. --The provider's collection effort should be
> documented in the patient's file by copies of the bill(s), follow-up
> letters, reports of telephone and personal contact, etc.

The Provider is in compliance here as well. As noted earlier, the Provider's in-house
collection department keeps thorough records of every collection letter, telephone contact
and all other collection efforts.

Section 310.2 of the PRM permits a debt unpaid for more than 120 days from the date the
first bill is mailed to the beneficiary to be deemed uncollectible. However, the
Intermediary argues that the language of that section implies discretionary rather than
mandatory application of the presumption, i.e., the debt "may" rather than "shall" be
deemed uncollectible. The Intermediary also points out that section 310.2 does not
suggest that this "presumption" relieves the Provider from meeting the general regulatory
documentation requirements or the specific documentation requirements in sections
310.B and 314 of the PRM. Thus, the presumption applies only where the Provider has
otherwise demonstrated through appropriate documentation that it engaged in reasonable
collection efforts before declaring the debt worthless. In the 58 audited accounts, the
amount of time from the first bill to write off varied from a low of 134 days to a high of
1793 days.[3]

The Board is also cognizant of pertinent sections of the MIM and related policy
memoranda that appear to include a countervailing presumption --- namely that accounts
assigned to an outside collection agency have "value" and are not "worthless" if the
accounts have not been returned to the provider as uncollectible by the outside agency.
Neither presumption is conclusive. Rather, the four enumerated criteria in C.F.R.
§413.80(e) control. And where, as here, the Provider has plainly satisfied those criteria,
neither presumption applies.

---

[3] P35.

The Secretary issued guidelines for an intermediary to follow when auditing cost reports. The MIM states that since Medicare bad debts for deductible and coinsurance are reimbursed as a pass-through cost, there is an incentive to claim bad debts before they become worthless.[4] This instruction also discusses that reliance on a collection agency may occur and the kind of documentation the Provider should maintain to support a conclusion that a reasonable collection effort has been made. Specifically, the instruction states that:

> If the bad debt is written-off on the provider's books 121 days after the date of the bill and then turned over to a collection agency, the amount cannot be claimed as a Medicare bad debt on the date of the write-off. It can be claimed as a Medicare bad debt only after the collection agency completes its collection effort.

MIM 13-4, Chapter 2 -- Guidelines for Performing Provider Audits, §4198.

The agency also issued policy memoranda, dated June 11, 1990 and April 1, 1992, which discussed the intent of the regulation and the Intermediary Manual. (These memoranda also discuss the effects of the moratorium on the allowance of bad debts. This issue is relevant here, and is discussed infra.) The June 11, 1990, memorandum states that:

> [U]ntil a provider's reasonable collection effort has been completed, including both in-house efforts and the use of a collection agency, a Medicare bad debt may not be reimbursed as uncollectible. This is in accord with the fourth criterion in section 308 which provides that an uncollected Medicare account cannot be considered an allowable Medicare bad debt unless sound business judgment established that there is no likelihood of recovery at any time in the future. We have always believed that, clearly, there is a likelihood of recovery for an account sent to a collection agency and that claiming a Medicare bad debt at the point of sending the account to the agency would be contrary to the bad debt policy in sections 308 and 310. . . .

As cited above, a provider is entitled to bad debts arising from Medicare coinsurance and deductibles. In order to be reimbursed for such bad debts, a provider must meet certain criteria. In demonstrating that the criteria have been met, among other things, a provider must show that the debts are actually uncollectible when claimed as worthless and sound business judgment established no likelihood of recovery in the future.

Contrary to the Intermediary's assertion, the June 11, 1990 policy memorandum does not establish a conclusive presumption that accounts assigned to an outside collection agency have value or are collectible. Nor does the policy memorandum obviate the sound business judgment rule or any of the other bad debt reimbursement criteria set forth in 42

---

[4] The amount of bad debts treated as allowable costs is reduced by 40% for cost reporting periods beginning during fiscal year 1999 42 C.F.R. §41.85(h).

C.F.R. §413.80. Rather, as occurred here, it is entirely possible for the Provider to satisfy all four of the criteria in 42 C.F.R. §413.80 as to any collection account that remains on "active" status with an outside collection agency.

The conclusive presumption urged by the Intermediary elevates form over substance. The mere "active" status of an account with an outside collection agency, while suggestive of collectibility, is not in and of itself *proof* of value *or* collectibility, especially in the face of evidence presented here. Further, a conclusive presumption of collectibility arising from an account's "open" or "active" status at an outside collection agency is contrary to both the reality of the collection trade and the regulations that the Board is entrusted to enforce. There is no evidence that providers control the decision making process of their outside collection agencies. Thus, an account that is actually worthless and uncollectible could languish as an "open" or "active" account in an outside collection agency indefinitely. The conclusive presumption proffered by the Intermediary would prohibit the reimbursement of such bad debts as required by 42 C.F.R. §413.80(d) and (e) and violates the prohibition against cross-subsidization at Section 1861(v)(1)(A) of the Social Security Act. Equally important, the conclusive presumption urged by the Intermediary would encourage, if not mandate, that the Provider "prompt" the return of accounts assigned to an outside collection agency. To overcome the Intermediary's conclusive presumption of collectibility, a provider could simply:

> 1.) Mail a series of automated collection notices to the beneficiary;
> 2.) Assign the account to an outside collection agency after 120 days; and
> 3.) Instruct the collection agency to mail its own series of automated collection notices and then promptly return the account to the provider as uncollectible.

The foregoing illustrates why neither the 120-day presumption of uncollectibility in the PRM nor the presumption of collectibilty of collection agency accounts in the Intermediary Manual can operate as conclusive presumptions. In the final analysis, the four criteria in 42 C.F.R. §413.80(e) must control, and to comply with that regulation, the Intermediary must evaluate the collection efforts and the sound business judgment applied by the Provider to each audited account.

The Intermediary also contends that the Provider's documentation is insufficient to establish that the 58 audited accounts were uncollectible when claimed as worthless. This contention is not supported by the evidence. The Intermediary stipulated to the accuracy of the data summarizing the Provider's collection efforts on each of the audited accounts,[5] and the Provider submitted its data printout on all 58 audited accounts.[6] The Provider also maintains a hard copy of correspondence and other collection related documents in each patient's file.[7] All of this documentation was made available to the

---

[5] P35.

[6] P30, 36.

[7] Tr. 120, 232-235.

Intermediary, as were all collection policies and procedures.[8] The collection efforts documented by the Provider meet the Secretary's requirements, and they were completed *before* the Provider determined the accounts to be uncollectible and worthless. The Intermediary's claim that the Provider should have "done more" to collect on decedents' and indigents' accounts is also difficult to fathom. Considering the amount owed on the decedent and indigent accounts audited by the Intermediary, the Board finds that the collection efforts and investigation by the Provider met or exceeded the efforts mandated by Medicare in every instance. Finally, it must be noted that the Intermediary's conclusive presumption of collectibility (based on outside collection account status) runs afoul of well established precedent, as would any conclusive presumption of uncollectibility (based on the so-called "120-day rule"). *Methodist Hospital of Dyesburg v. Blue Cross and Blue Shield*, PRRB Case No. 96-1215, Decision No. 00-D56 ("Methodist Hospital") is instructive. In *Methodist Hospital*, the Board considered both the 120-day presumption of uncollectibility and the presumption of collectibility urged by the Intermediary here.

The Board has consistently held that where the Provider satisfies all four criteria of 42 C.F.R. §413.80(e), any presumptions of collectibilty or uncollectibility are necessarily moot, and the bad debt must be reimbursed.[9] To hold otherwise would violate Medicare's prohibition on cross-subsidization by requiring a non-beneficiary (here, the Provider) to bear the cost of Medicare covered services. [Section 1861(v)(1)(A) of the Social Security Act; 42 C.F.R. §413.80].

The Board also finds that the Intermediary's present rejection of the Provider's bad debt policy, after having repeatedly accepted it for prior years, is statutorily barred. In this case, the Provider established that it writes off worthless and uncollectible Medicare accounts shortly after those accounts are forwarded to an outside collection agency. This is consistent with the Provider's pre-August 1987 policy, wherein the Provider customarily wrote off Medicare accounts as bad debts at or about the time the accounts were assigned to an outside collection agency. But beginning with the FYE 1999 audit, the Intermediary for the first time rejected bad debt submissions on accounts that remained "active" with an outside agency. In §6023 of the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239 (Dec. 19, 1989), Congress expressly

---

[8] Tr. 223-226.

[9] The Board was also presented with a host of other persuasive authorities by the parties in Methodist Hospital, many of which are also presented here, including: Lourdes Hospital v. AdminaStar of Kentucky, PRRB Dec. Nos.95-D58, 95- D59, 95-D60, Medicare and Medicaid Guide (CCH) ¶43,585 (1995); King's Daughters' Hospital v. Blue Cross and Blue Shield of Kentucky, PRRB Dec. No. 91-D5, Medicare and Medicaid Guide (CCH) ¶38,950 (1990); St. Francis Hospital and Medical Center v. Kansas Hospital Service Assn., PRRB Dec. No. 86-D21, Medicare and Medicaid Guide (CCH) ¶35,302 (1985), and Scotland Memorial Hospital v. Blue Cross and Blue Shield Association of North Carolina, PRRB Dec. No. 84-D174, Medicare and Medicaid Guide (CCH) ¶34,225 (1984).

prohibited such conduct. Amending the moratorium it had imposed two years earlier on regulatory changes to the bad debt collection rules, Congress provided:

> The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigence determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

The above prohibition is directly applicable to this case. The Intermediary, applying program rules in effect on August 1, 1987 with respect to collection agency referrals, accepted the Provider's bad debt collection policy before that date. It cannot now apply the same rules to declare the policy unacceptable.

The Intermediary contends that the Provider's documentation is insufficient proof of the Intermediary's pre-1987 acceptance of the bad debt collection write-off policy described above. The Intermediary posits that the Provider must produce the Intermediary's pre-1988 audits to prove that the Intermediary accepted the Provider's pre-August 1, 1987 policy of writing off accounts as bad debt at or about the time the debts were assigned to an outside collection agency.[10] The Intermediary cites no law or regulation that suggests that the Provider must retain the Intermediary's audit reports or NPRs for over 15 years, or that such reports are the only acceptable documentation of the Intermediary's acceptance of pre-August 1987 collection policies. The certification of the Provider's Chief Financial Officer (CFO) is the only documentation on this issue, and it was presented to the Intermediary in August 2003, 20 months before the hearing.[11] The Intermediary had 20 months to search its files to find records that would rebut the Provider's documentation but failed to do so.

The certification of the Provider's CFO and the testimony at the hearing established that:

1.) The Provider's CFO was employed by the Provider prior to August 1, 1987 through August 2003.

2.) Prior to August 1, 1987, and at all times preceding the Intermediary's FYE 1999 audit, the Intermediary had accepted the Provider's policy and procedure of writing Medicare accounts off as bad debts at or about the time that the accounts were assigned to a collection agency.[12]

---

[10] Tr. 214-223.

[11] P36, Tab 5A pp14-15; Tr. 214-216.

[12] Tr. 56-58; P33, 36.

Page 12                                                    CN: 04-0426

Under section 6023 of OBRA, the Intermediary cannot now require the Provider to change this bad debt collection policy.[13]

DECISION AND ORDER:

The Medicare bad debts for FYE 1999 are allowable. The Intermediary's adjustments are reversed.

BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esquire
Gary B. Blodgett, D.D.S.
Elaine Crews Powell, C.P.A.
Anjali Mulchandani-West

FOR THE BOARD:

FEB 1 7 2006

Suzanne Cochran, Esquire
Chairperson

_____

[13] The Board notes that its finding here does not enable the Provider to obtain reimbursement in otherwise collectible Medicare accounts. The Provider established that, as to the Medicare accounts at issue in the FYE 1999 audit, sound business judgment established that there was no likelihood of recovery at the time the accounts were turned over to the Provider's outside collection agency. The Intermediary offered no evidence to the contrary, and the Provider's documentation of this is sufficient. Again, no money has been collected by the outside collection agency on *any* of the 58 audited accounts assigned over five years ago.

# EXHIBIT 3

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## CENTERS FOR MEDICARE & MEDICAID SERVICES
### OFFICE OF THE ATTORNEY ADVISOR

---

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Gregory Hatton, Esq. | Jacqueline Vaughn |
| Hatton, Pettie & Stackler | Office of the Attorney Advisor |
| **COMPANY:** | **DATE:** |
| Provider's Representative | 03/07/06 |
| **FAX NUMBER:** | **TOTAL NO. OF PAGES INCLUDING COVER:** |
| (949) ~~468-3010~~  474-1244 | 3 |
| **PHONE NUMBER:** | **SENDER'S PHONE NUMBER:** |
| (949) 474-4222 | 410-786-3176 |

RE: DAMERON HOSPITAL, PRRB NO. 2006-D16

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your system. Thank you.

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043

**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES

**Office of the Attorney Advisor**

VIA FACSIMILE

MAR – 7  2006

Gregory Hatton, Esq.
Hatton, Petrie & Stackler
20311 Birch Street
Newport Beach, CA 92660

Re: Dameron Hospital, PRRB Dec. No. 2006-D16

Dear Mr. Hatton:

This is to notify you that the Administrator, on own motion, will review of the above captioned PRRB decision concerning whether the Intermediary's disallowance of the Provider's inpatient and outpatient Medicare bad debts was proper.   Accordingly, this case will before the Administrator, CMS, for review within the next few weeks.

Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be review in light of prior decisions of the Administrator and relevant court decisions.    The governing regulation published at 42 CFR 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 768-0043 so as to expedite review.**

An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision.  I will promptly send you a copy of the decision after it has been rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc: James R. Grimes, Esq., Intermediary's Representative
    Center for Medicare Management, CMS

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043

**CMS/**
CENTERS for MEDICARE & MEDICAID SERVICES

**Office of the Attorney Advisor**

VIA FACSIMILE

MAR    7   2006

James R. Grimes, Esq.
Blue Cross and Blue Shield Association
225 North Michigan Avenue
Chicago, IL  60601-7680

Re: Dameron Hospital, PRRB Dec. No. 2006-D16

Dear Mr. Grimes:

This is to notify you that the Administrator, on own motion, will review of the above captioned PRRB decision concerning whether the Intermediary's disallowance of the Provider's inpatient and outpatient Medicare bad debts was proper. Accordingly, this case will before the Administrator, CMS, for review within the next few weeks.

Involved will be whether the Board's decision is in keeping with the pertinent laws, regulations, and other criteria cited by the Board and by the parties in their comments. The Board's decision will be review in light of prior decisions of the Administrator and relevant court decisions. The governing regulation published at 42 CFR 405.1875 explains the procedures in conducting final agency review of decisions made by the Board. You have a right to submit comments within 15 days of your receipt of this letter. **If you do submit comments, we would appreciate your faxing them to this office at (410) 768-0043 so as to expedite review.**

An Administrator's decision must be rendered within 60 days after the Provider received the Board's decision. I will promptly send you a copy of the decision after it has been rendered.

Sincerely,

Jacqueline R. Vaughn
Attorney Advisor

cc: Gregory Hatton, Esq., Provider's Representative
    Center for Medicare Management, CMS

41

# EXHIBIT 4

# IN RE: PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2006-D16

| | |
|---|---|
| **PROVIDER**<br>DAMERON HOSPITAL ASSOCIATION,<br><br><br>Provider No. 05-0122/7699,<br><br>vs.<br><br>**INTERMEDIARY**<br>UNITED GOVERNMENT SERVICES, LLP | **PROVIDER DAMERON HOSPITAL ASSOCIATION'S COMMENTS TO THE CMS ADMINISTRATOR**<br><br>Cost Reporting Period Ended - December 31, 1999<br><br>Case No. 04-0426<br><br>PRRB DECISION 2006-D16 |

| Case Heard: | 4.14.05 |
|---|---|
| PRRB Decision Published: | 2.17.06 |
| CMS' Notice of Review: | 3.7.06 |
| Comments Faxed to CMS: | 3.22.06 |

## INDEX

Statement of the Ultimate Issue Resolved in Decision 2006 D-16....................2

Summary of the Record Under Review.................................................................2

Summary of Evidence Presented at the 4/14/05 Hearing..........................................3

Comment re: Issues Resolved in PRRB Decision 2006-D16....................................7

Conclusion..............................................................................................................11

ISSUE

Whether the Intermediary's elimination of the Provider Inpatient and Outpatient Regular Medicare Bad Debts was proper.

SUMMARY OF THE RECORD UNDER REVIEW:

Provider Dameron respectfully directs the Administrator's attention to the following record: Dameron Hospital ("the Provider") is a general short-term provider located in Stockton, California. The Provider has 195 licensed beds. The Provider's acute and HHA services were certified to participate in the Medicare program on July 1, 1966.

The NPR for Financial Year Ending ("FYE") 1999 was issued July 22, 2003. The Intermediary's adjustment number 33 completely disallowed all Medicare bad debts, based on **an audit of 58 of the 142 accounts** submitted for reimbursement. The Intermediary's account-by account audit summary is exhibit P-36-5.

The amount of Medicare reimbursement in controversy is $38,000. The Provider's calculation of the reimbursement is $64,220 X 0.60, which is the bad debt reduction factor applicable to 1999.

The Provider timely appealed in January, 2004. [42 CFR §§ 405.1835-1841]. The Provider submitted Preliminary, Final, and Supplemental Final Position Papers. The Intermediary submitted a combined Preliminary and Final Position Paper, and a Supplemental Final Position Paper.

The PRRB heard the case on April 14, 2005.

At the hearing, the Board admitted Provider Exhibits P1 through P-36, including subparts, without objection. P-36 is a compilation of the Provider's Frequently Referred to Exhibits, excerpted from P-1 through P-35. Exhibit P-36-5 is a grid summarizing the Provider's collection efforts in each of the 58 audited accounts, which the Intermediary stipulated is accurate. The Provider also presented the live testimony of its in-house Credit and Collections Department Manager.

The Board also admitted Intermediary Exhibits I-1 through I-7, with subparts, without objection. The Intermediary presented the testimony of its Audit Manager.

York Stenographic Services prepared a 244 page transcript of the hearing.

On February 17, 2005, the PRRB published Decision 2006 D-16.

- 2 -

On March 7, 2006, the CMS' Office of the Attorney Advisor faxed Notice of the
Administrator's Review, *sua sponte*, to counsel for the Provider and for the Intermediary, inviting
comments within 15 days (by March 22, 2006).

On March 22, 2006, counsel for the Provider faxed CMS' Attorney Advisor the Provider's
Comments on PRRB Decision 2006-D16, set forth below.

## SUMMARY OF THE EVIDENCE PRESENTED AT THE APRIL 14,2005 HEARING:

The Intermediary audited 58 of 142 accounts on the Provider's FYE 1999 Bad Debt Report.
*The following information was available to the Intermediary at the time of the audit*:

The Provider initially worked the accounts in its in-house credit and collection department.
The evidence and the testimony established that the Provider's *in-house* collection efforts on *all* 58
accounts uniformly exceeded the "reasonable collection efforts" required by Medicare regulations.[1]
Further, the Provider did not rely on the "120 day presumption of uncollectibility"[2] in determining
any of the 58 accounts *actually worthless*.

The Provider processed all indigent and deceased beneficiary accounts in the audit sample in
strict accordance with Medicare procedures. The remaining accounts were sent with other
uncollectible non-Medicare accounts to an outside collection agency contracted to accept all
accounts assigned by the Provider. The outside collection agency then worked the valueless
assigned Medicare accounts, also collecting nothing on any of them.

After the outside agency worked the worthless accounts for a period of time, the Provider
wrote them off, and submitted them for reimbursement as regular Medicare bad debt. Since writing
off the 58 accounts *no money* has been collected on any of them, even though some remained listed
as "active" at the outside agency at the time of the audit.

The Intermediary never found or produced *evidence* to contradict any of these facts.
Nevertheless, the Intermediary denied the Provider's Regular Bad Debt Reimbursement Claim for
FYE 1999 in its entirety. The Intermediary did so for two alleged reasons:

- 3 -

*1. The Provider failed to establish that the debts in various audited accounts were "actually uncollectible when claimed as worthless."* [3]

The Intermediary concluded that accounts proven worthless in fact had "value," even though, following extraordinary collection efforts both in-house and at an outside agency, there was *no basis in fact* to support a conclusion that any of the 58 audited accounts had value. In reaching its conclusion, the Intermediary relied *solely* on the fact that 30 of the 58 audited accounts were listed as "active" or "open"[4] at an outside collection agency.

The Intermediary also claimed that the Provider failed to sufficiently document that, prior to August, 1987, the fiscal intermediary had accepted the Provider's practice of writing off beneficiary accounts that were listed as "active" at an outside collection agency, and submitting them for Regular Medicare Bad Debt reimbursement. Thus, the Intermediary concluded that the Provider's practices were *not* authorized under O.B.R.A. of 1989, Pub. L. No. 101-239 (12.19.89).

*2. The Provider's collection efforts were "inconsistent," and the Provider failed to document that it followed its standard collection policies and procedures in accounts audited by the Intermediary.* [5]

The Provider's in-house patient account and collection personnel tailor the Provider's collection efforts to the specific circumstances of every patient's account, Medicare and non-Medicare alike. Without any supporting evidence, the Intermediary concluded that the Provider's personalized approach violates regulations requiring the Provider to treat Medicare and non-Medicare accounts alike.

The Provider's in-house collection personnel are also authorized to suspend automated collection notice generation, and personalize collection notices to suit the facts and circumstances in each account as they develop. This is also true for Medicare and non-Medicare accounts alike.

The Intermediary never interviewed the Provider's Credit and Collection Manager to determine that these personalized collection practices in fact comply with the Provider's in-house procedures. Instead, the Intermediary concluded that the Provider's failure to send the same identical sequence of automated notices in all of its accounts (whether or not the automated notices are relevant to the true status of the account) violated the Provider's own collection procedures,

- 4 -

thereby resulting in "inconsistent collection efforts" proscribed by Medicare regulations.

**In response to the Intermediary's contentions and evidence, the Provider proved all of the following at the hearing with *unrebutted* evidence:**

As noted, the Provider applies similar collection policies and procedures to Medicare and non-Medicare patient accounts. The Provider's in-house collection department works each patient account based upon the facts and circumstances unique to each account.[6]

Patient accounts with unpaid Medicare co-insurance and deductibles are referred to in-house collection department, based on the same criteria as any other unpaid patient account. The Provider applies identical criteria to determine the appropriate level of effort for Medicare and non-Medicare collection accounts alike.[7]

The Provider's collection process commences with a pre-programmed series of automated collection notices. However, once the patient (or other responsible payer) is engaged by the Provider, the collector and his/her supervisors take action appropriate to the specific account. These account specific collection practices are applied to Medicare and non-Medicare accounts alike.[8]

The Provider's in-house collection department applies and documents collection efforts on Medicare accounts sufficient to establish that an account is actually uncollectible and worthless before the Provider writes off the account as bad debt. Per an agreement with an outside collection agency that receives *all* of the Provider's collection accounts, the Provider forwards uncollectible Medicare and non-Medicare accounts to the collection agency. The Provider's collection agency then works the worthless accounts in the same manner as all other accounts.[9]

In the "sound business judgment" of the Provider, no Medicare account forwarded to an outside agency has a reasonable likelihood of collection. If it did, the provider's in-house collection department would continue to work it.

The Provider carries worthless Medicare accounts as "open" for a period of time following assignment to the Provider's outside collection agency. Thereafter, the Provider writes off the accounts as bad debts.[10] There are two purposes served by this collection policy:

1.) Medicare regulations [CFR 413.80(e)] require a Provider claiming bad debt to demonstrate that, "sound business judgment established that there was no likelihood of recovery at

anytime in the future."   By requiring its outside collection agency to work worthless Medicare accounts, the Provider tests its "business judgment" regularly, to confirm that it is "sound." And in this case, the collection agency's efforts prove that the Provider's "business judgment" was "sound." Again, after the Provider wrote off the audited accounts as bad debt, no money has been collected on any of the 58 accounts, despite the Provider's collection efforts, and the efforts of the outside collection agency.[11]

2.) By deferring bad debt write-offs during early outside collection efforts, the Provider keeps worthless Medicare accounts positioned for an *unforeseen* "direct response" from the beneficiary.[12] When this is not forthcoming, the account is written off to bad debt.[13]

The Intermediary stipulated to the accuracy of the account activity data summary on Exhibit P-36-5 (also submitted as Exhibit P-35). The average number of notices and contacts on these accounts is extraordinary. Each audited account was worked well in excess of 120 days prior to write-off (the accounts ranged from 159 days from opening to write-off, to 1793 days from opening to write-off).

The Provider's documentation of its decedent asset investigations, and indigency determinations was appropriate in each account questioned by the Intermediary in the FYE 1999 audit. The Provider conducts an in-house estate and assets investigation on all decedents' accounts. Where the amount of the debt justifies the cost, the Provider then refers decedents' accounts to an outside attorney, to conduct a more in-depth search for assets available to pay decedents' accounts.[14] Indigence determinations included not only a financial statement from the beneficiary, but a face-to-face interview with the Provider's administrative personnel, in which other potential sources of payment were explored.[15]

Finally, the certification of the Provider's Chief Financial Officer and the testimony at the hearing establish that the Provider was in fact entitled to utilize write-off procedures accepted by the fiscal intermediary prior to August, 1987:

1.)   Prior to August 1, 1987, Dameron wrote off Medicare accounts as bad debt at or about the time that they were assigned to an outside collection agency; and

-6-

2.)     Prior to the August 1, 1987, and until FYE 1999 audit, the Intermediary had accepted
        this collection practice.[16]

## DISCUSSION OF ISSUES RESOLVED BY PRRB DECISION  2006 D-16:

The thrust of the Board's decision is fundamental:   If a beneficiary's account meets all four
criteria listed in 42 C.F.R. section 413.80 (e), any conclusions of "collectibility" or "value" are
rebutted, and the Provider is entitled to reimbursement.

The Provider is mindful of the Secretary's interpretive authority, and of the lawful delegation
of that authority in the proceedings now before the CMS Administrator. However, the Provider
respectfully submits that Congress has not empowered fiscal intermediaries to re-write Medicare law
by elevating rebuttable presumptions into conclusive ones.  Fundamental concepts of due process
entitle Providers who meet the requirements of section 413.80(e) to reimbursement of regular
Medicare bad debt.

### 1. *"Battle Creek"* Does Not Establish a *Conclusive* Presumption of Collectibility:

The Provider's Reimbursement Manual ("PRM"), section 310.2 permits a debt unpaid
for more than 120 days from the first billing of the beneficiary to be deemed *uncollectible*.  A
countervailing presumption is found in the Medicare Intermediary's Manual ("MIM").  Part IB, 13-2
of the MIM includes the presumption that any account that remains on "active" or "open" status with
the Provider's outside collection agency has "value" and is therefore *collectible*.

Neither the presumption of *uncollectibility* in the PRM, nor the presumption of *collectibility*
in the MIM are conclusive. And where, as here, the Provider satisfies all four of the criteria in 42
CFR 413.80(e), *neither* presumption applies.  [*Methodist Hospital of Dyesburg v. Blue Cross and
Blue Shield*, PRRB Case No. 96-1215, Decision No. 00-D56; :  *Lourdes Hospital v. AdminaStar of
Kentucky*, PRRB Dec. Nos.95-D58, 95- D59, 95-D60, *Medicare and Medicaid Guide* (CCH)
¶43,585 (1995); *King's Daughters' Hospital v. Blue Cross and Blue Shield of Kentucky*, PRRB Dec.
No. 91-D5, *Medicare and Medicaid Guide* (CCH) ¶38,950 (1990); *St. Francis Hospital and Medical
Center v. Kansas Hospital Service Assn.*, PRRB Dec. No. 86-D2 1, *Medicare and Medicaid Guide*
(CCH) ¶35,302 (1985), and *Scotland Memorial Hospital v. Blue Cross and Blue Shield Association*

*of North Carolina,* PRRB Dec. No. 84-D 174, *Medicare and Medicaid Guide* (CCH) ¶34,225 (1984).]

In a recent published opinion entitled *Battle Creek Health System v Blue Cross Blue Shield Assn. ["Battle Creek"],* the Administrator wrote:

> "If a provider continues to attempt collection of a debt, either through in-house or a collection agency, it is *reasonable to conclude* that the provider still considers that debt to have value and not worthless. Thus, contrary to the Provider's argument, the Administrator finds it reasonable to expect a provider to demonstrate that it has completed its collection effort, including outside collection, before claiming debts as worthless."

*Battle Creek Health System v Blue Cross Blue Shield Assn.* (review of PRRB Dec. No.2004 D-40), Nov. 12, 2004. [Italics added.]

In this case, the bad debt claims were denied before *Battle Creek* was published. Nevertheless, at the April, 2005 hearing, the Intermediary relied on the same reasoning underlying the Administrator's opinion in *Battle Creek.*[17]  The Intermediary argued in essence that the mere status of a collection account at an outside agency as "open" or "active" operates as *conclusive proof* that it is not "worthless, and that it has "value." But in the face of unrebutted evidence that all 58 audited accounts are *actually worthless,* the Intermediary's attempt to elevate the presumption stated in *Battle Creek* to conclusive proof necessarily goes "a bridge too far."

It is important to recognize that, in *Battle Creek,* the Administrator does *not* say that the "reasonable conclusion" of collectibility is unrebuttable by *evidence* of the type submitted by the Provider here. If the so-called *"Battle Creek* presumption" were conclusive, then reimbursement in beneficiary accounts that are indisputably valueless could be denied *merely because those accounts reside at an outside collection agency instead of in-house with the Provider.*

To establish that a Medicare patient account is reimbursable bad debt, a provider needs to prove **all four** of the following elements under 42 C.F.R section 413.80(e):

(1) The debt is for patient deductibles and coinsurance for Medicare covered services.

(2) Reasonable collection efforts [i.e., the same efforts as on non-Medicare accounts] were made.

(3) The account is actually uncollectible when claimed as worthless.

(4) Sound business judgment shows no likelihood of collection in the future.

- 8 -

The Provider is unable to find a published federal court opinion that holds that *any* presumption of "collectibility" or uncollectibility" has ever been held *conclusive* by the courts. Compelling evidence that an account does or does not meet the regulatory criteria for reimbursement can ultimately rebut any such presumption. And in this case, the evidence that all 58 accounts were actually worthless following extraordinary collection efforts was just that: compelling.

A conclusive "*Battle Creek* presumption" is also inconsistent with the realities of the collection trade. Utterly worthless accounts are commonly assigned in bulk to outside agencies along with other "problem" accounts. The mere fact that a worthless account that meets all four reimbursement criteria happens to "reside" at an outside collection agency proves *nothing* about the "value" of that account. But if, as the Intermediary suggests, the "*Battle Creek* presumption" were conclusive, the Provider would have to "prompt" the return of worthless Medicare accounts from the outside agency so that they would not "reside" there at the time of their submission for reimbursement as regular bad debt.

Prompting the return of Medicare accounts from an outside collection agency has problems of its own. The practice implicates the "reasonable efforts" requirements in the regulations, which require the Provider to treat Medicare and non-Medicare accounts alike. Once the Provider begins prompting the outside agency to return Medicare accounts, the Provider must prompt the return of non-Medicare accounts, as well. In other words, in order to comply with Medicare's mandate that non-Medicare collections be treated the same as collections on Medicare accounts, the Provider would also have to put non-Medicare accounts on the same "short leash" as Medicare accounts.

Further, all of this assumes that a collection agency would put up with tight, provider-driven time constraints on *all* assigned accounts. Such artificial constraints are generally inconsistent with collection agency practices. It is common knowledge that time is a significant ally of the outside collection agent. It is doubtful that reputable collection agencies would accept bulk assignments of Medicare and non-Medicare accounts subject to the time constraints that could result from a conclusive "*Battle Creek* presumption."

**2. The Provider's Practice of Writing Off Bad Debt At or About the Time of Assignment To an Outside Agency Was Accepted By the Fiscal Intermediary Prior to August 1987:**

Under OBRA 1989 [Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239 (12.19.89)], a provider who writes off bad debt at the time of assignment to an outside collection agency, and also submits it to Medicare for reimbursement as well, can continue that practice, as long as the Intermediary approved it prior to August 1, 1987.

Obviously, providers "grandfathered in" prior to 1987 do not have to contend with a "*Battle Creek* denial," since the practice of writing off bad debt at the time it is assigned to outside collection has been approved by an intermediary. Thus, the fact that the account may be "active" at an outside collection agency is no longer a factor.

In this case, the Intermediary refused to acknowledge that the Provider had established a practice, prior to 1987 of writing off collection accounts as bad debt at or about the time of assignment to an outside agency. The Intermediary demanded that the Provider provide copies of pre-1987 audit reports to establish this proof.

Like most hospitals, the Provider does not retain such records for over 15 years, as "required" by the Intermediary. The Intermediary admitted that it knew of no law requiring Dameron to hand onto the *Intermediary's* audit reports for over 15 years. And the Intermediary admitted that it had not checked its own records to determine whether it had a copy of audit work papers dating back to the mid-eighties time frame relevant to the OBRA 1989 rule.[18]

Decision 2006-D16 states that the certification of Dameron's CFO is sufficient to establish that Dameron's practice of writing off bad debt at or about the time of assignment to an outside collection agency had been accepted by the fiscal intermediary prior to 1987.

Specifically, the CFO's certification (presented to the Intermediary in response to the NPR published in 2003) establishes that the CFO was employed by the Provider prior to 1987, and that, the Intermediary had always accepted the Provider's bad debt write-off practices and policies[19] prior to the audit at issue here. This evidence was also unrebutted.

### 3. *The Intermediary's "Inconsistent Efforts" Denial is Unsupported By Evidence or Law:*

Like most modern corporations, the Provider's automated in-house collection procedures allow its employees to "customize" collection efforts based upon the individual facts presented in each account. Because the Provider tailors its collection efforts based upon the patient's ability to pay, willingness to cooperate, and other individual considerations, its collection efforts are not identical in every account. The Provider's personalized collection efforts are applied to Medicare and non-Medicare accounts alike, and, as discussed above, go far beyond the collection efforts required by Medicare

Based on these personalized collection efforts, the Intermediary claimed that the Provider did not use "consistent" collection efforts in all Medicare and non-Medicare accounts, and therefore violated the "reasonable collection efforts" requirements of 42 C.F.R. 413.80(e).

The attached PRRB decision disposes of this "Catch-22" by simply noting that, in each of the 58 audited accounts, the Provider's in-house collection efforts met and exceeded Medicare requirements *before* accounts were either retired as indigent or deceased accounts, or assigned to outside collection.

### CONCLUDING REMARKS:

The controlling law and regulations here are basic:

42 CFR §413.80(a) provides that bad debts attributable to the deductible and coinsurance amounts of Medicare beneficiaries are reimbursed under the Medicare program. (See also, Section 304 of PRM.)

Recognizing the reasonable costs principle at Section 1861(v)(1)(A) of the Social Security Act which prohibits cross subsidization, the program states that the inability of Providers to collect deductibles and coinsurance amounts from the Medicare beneficiaries could result in part of the costs of Medicare covered services being borne by individuals who are not beneficiaries. Therefore, to prevent such cross-subsidization, Medicare reimburses Providers for allowable bad debts. (See Id.)

Consequently, Providers may receive reimbursement for Medicare bad debt, if they meet all of the criteria set forth in 42 CFR §413.80(e):

(1) The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2) The Provider must be able to establish that reasonable collection efforts were made.

(3) The debt was actually uncollectible when claimed as worthless.

(4) Sound business judgment established that there was no likelihood of recovery at any time in the future. (See also Section 308 of the PRM.)

Under the Secretary's interpretive authority, the Provider Reimbursement Manual (PRM) has been issued, which clarifies the reimbursement regulations. Relevant to the issue in this case, Section 310 of the Manual states:

"To be considered a reasonable collection effort, a Provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the Provider puts forth to collect comparable amounts from non-Medicare patients."

Under the unrebutted evidence presented to the PRRB, the Provider is entitled to reimbursement on all 58 accounts. The fact that some of the accounts may have "resided" at an outside collection agency at the time of the FYE 1999 audit cannot overcome the overwhelming evidence that each of the 58 audited accounts are now, and were "actually uncollectible when claimed as worthless," and without any "likelihood of recovery in the future."

Although the Provider has proved its right to reimbursement without reliance on OBRA 1989, that law renders the Intermediary's reliance on Pat I B 13-2 of the MIM and the so-called "*Battle Creek* presumption" inapplicable here. The provider has proved (again, with uncontradicted evidence) that, prior to August, 1987, the fiscal intermediary accepted its practice of writing off bad debt, and submitting it for regular bad debt reimbursement at or about the time of assignment to an outside collection agency.

Finally, the "inconsistent efforts" allegation by the Intermediary is contradicted by the evidence and the law. The Provider's in-house collections department personalizes its collection

efforts to respond to the facts and circumstances that are understandably unique into some extent in each collection account.  These personalized efforts are the model of thoroughness and consistency in Medicare and non-Medicare accounts alike, because they focus on the factors that maximize collections in each account.  These collection efforts meet and exceed Medicare's requirements in every conceivable regard.

Respectfully Submitted By:

Date: _____

_____

Gregory M. Hatton
Hatton, Petrie & Stackler APC
Counsel for the Provider,
Dameron Hospital Association

---

[1] See stipulated summary of collection efforts, P36-5
[2] PRM, section 310.2
[3] Tr. 32-33.
[4] P 36-3; I-6
[5] Tr. 27.
[6] Tr. pp 42-48; P30, 35, 36.
[7] Tr. 42-52; P30, 35, 36.
[8] Tr. 42-52; 64-68; 140-144; 156-157; P30, 35, 36.
[9] Tr. 53-54; 61-62, P30, 35, 36.
[10] Tr. 52-55; 58-63, 133-134.
[11] P35; Tr. 53-56; 75-77; 89-90; 133-1234; P30, 36
[12] Tr. 162-165
[13] Tr. 133-134
[14] Tr. 101-110; P36.
[15] Tr. 110-128; P36.
[16] Tr. 56-58; P33, 36.
[17] P 36-3; I-6
[18] Tr. 214-219
[19] P36-5-A-14 (certification sent to Intermediary under cover of 8.14.03 letter)

# EXHIBIT 5





**BlueCross BlueShield
Association**

An Association of Independent
Blue Cross and Blue Shield Plans

225 North Michigan Avenue
Chicago, Illinois 60601-7680
312.297.6000
Fax 312.297.6609
www.BCBS.com

March 3, 2006

Jacqueline R. Vaughn
Center for Medicare & Medicaid Services
Office of the Attorney Advisor
7500 Security Blvd.
Baltimore, MD 21244-1850

Re:   Damaron Hospital
      PRRB Decision No. 2006-D16
      PRRB Case No. 04-0426

Dear Ms. Vaughn:

Pursuant to Regulation 405.1885, the Intermediary respectfully
requests that the CMS Administrator review the above captioned
PRRB Decision.

The Provider, in this case, wrote off its bad debts when the in-house
collection effort was completed, but then sent the accounts to an
outside collection agency. Upon audit, the Intermediary determined
that accounts claimed as bad debts on the Medicare cost report were
still marked as active accounts at the collection agency. The
Intermediary then determined, among other things, that the Medicare
accounts at the collection agency cannot be deemed worthless and
uncollectible until collection agency activity has stopped and the
accounts are returned to the Provider.

The Intermediary maintained that under Medicare rules, including
CMS instructions, accounts at an outside collection agency cannot be
considered to be worthless or uncollectible because collection activity
is ongoing. If the accounts are not determined to be worthless and
uncollectible, then they cannot be considered as bad debts for cost
reporting purposes. However, the PRRB determined the
Intermediary was in error and that Medicare regulation, program
instructions and CMS memorandums do not establish any
presumption that accounts assigned to an outside collection agency
should be considered to have value because collection efforts
continue.

Jacqueline R. Vaughn
March 3, 2006
Page 2

The Intermediary believes the PRRB's reasoning in this case violates the regulations and program instructions. We therefore request the Administrator review the decision.

Very truly yours,

James R. Grimes
Associate Counsel

cc:    Gregory M. Hatton, Esq.



DEPARTMENT OF HEALTH & HUMAN SERVICES

Centers for Medicare & Medicaid Services

R E C E I V E

7500 Security Boulevard
Baltimore, MD 21244-1850
MAR 1 0 2006

PATTON, PETRIE & STACKLER APC

MAR ·7 2006

FROM:       Director
            Chronic Care Policy Group, Center for Medicare Management

SUBJECT:    Provider Reimbursement Review Board (PRRB) Decision No. 2006-D16,
            Dameron Hospital, Provider No.: 05-0122

To:         Director
            Office of the Attorney Advisor

In the subject decision, the Board reversed the Intermediary's adjustments disallowing Medicare bad debts related to coinsurance and deductible amounts the provider had sent to a collection agency. For the reasons stated below, the Chronic Care Policy Group (CCPG) does not concur with the Board's decision.

In order for bad debts to be an allowable reimbursable cost under Medicare, they must meet the criteria set forth in 42 CFR 413.89 and the requirements in the Provider Reimbursement Manual (PRM), Part I, Chapter 3. The regulation at 42 CFR 413.89 states that to be allowable, a bad debt must meet the following criteria:

(1)    The debt must be related to covered services and derived from deductible and coinsurance amounts.
(2)    The provider must be able to establish that reasonable collection efforts were made.
(3)    The debt was actually uncollectible when claimed as worthless.
(4)    Sound business judgment established that there was no likelihood of recovery at any time in the future.

PRM Chapter 3 provides specific guidelines to meet the criteria in 42 CFR 413.89. Section 310.2, Presumption of Noncollectibility, provides that, "If after reasonable and customary attempts to collect a bill, the debt remains unpaid more than 120 days from the date the first bill is mailed to the beneficiary, the debt may be deemed uncollectible." Medicare's intent has always been that §310.2 be read within the context of the bad debt policy provided in §308 and §310. That is, after reasonable and customary efforts to collect a bill, an unpaid Medicare debt cannot properly be deemed uncollectible just because it remains unpaid for longer than 120 days from the date that the first bill is mailed to the beneficiary. A Medicare bad debt is not reimbursable until the provider's reasonable collection effort, including the use of a collection agency, has been completed.

The June 11, 1990 bad debt policy memorandum to the Regional Administrators cited by the Board clarified Medicare's intent of the regulation and the manual providing:

That is, until a provider's reasonable collection effort has been completed, including both in-house efforts and the use of a collection agency, a Medicare bad debt may not be reimbursed as uncollectible. This is in accordance with the fourth criteria in section 308 which provides that an uncollected Medicare account cannot be considered an allowable Medicare bad debt unless sound business judgment established that there is no likelihood of recovery at any time in the future. We have always believed that, clearly, there is a likelihood of recovery for an account sent to a collection agency and that claiming of a Medicare bad debt at the point of sending the account to the agency would be contrary to the bad debt policy in sections 308 and 310.

Contrary to the Board's belief, we believe that the instructions in the Medicare Intermediary Manual (MIM) are not contrary to, but rather are in accordance with, the policy in the PRM. An account that remains on active or open status does have value and therefore is, or at least may be, collectible. That is the reason for keeping the account open at the collection agency. If a provider believes an account is uncollectible, presumably it would cease all collection effort. The Board cites instructions at MIM 13-4, Chapter 2, §4198 stating that:

If the bad debt is written-off on the provider's books 121 days after the date of the bill and then turned over to a collection agency, the amount cannot be claimed as a Medicare bad debt on the date of the write-off. It can be claimed as a Medicare bad debt only after the collection agency completes its collection effort.

CMS' position that an account sent to a collection agency is not claimable as a bad debt until after the agency has completed its collection effort is further supported by the Deputy Administrator's decision in a similar situation[1] in which a provider claimed bad debts after sending the accounts to a collection agency:

If a provider continues to attempt collection of a debt, either through in-house or a collection agency, it is reasonable to conclude that the provider still considers that debt to have value and not worthless. Thus, contrary to the Provider's argument, the Administrator finds it reasonable to expect a provider to demonstrate that it has completed its collection effort, including outside collection, before claiming debts as worthless.

---

[1] Battle Creek Health System and Mercy General Health Partners vs. Blue Cross Blue Shield Association/United Government Services, LLC (Decision No. 2004-D40)

According to the procedural history (on page 2 of the decision), in 1999 United Government Services became the Provider's intermediary and conducted its first audit of the Provider's debt collection policies and activities, disallowing bad debts for Medicare accounts for which the Provider deemed the accounts uncollectible after exhausting its in-house collection efforts and sending the accounts to an outside collection agency.

In the June 11, 1990 memorandum, Medicare addressed the impact of the hospital bad debt moratorium (the moratorium).[2]  First, the memorandum made clear that Medicare's position had always been that a Medicare bad debt could not be properly claimed while the account was at a collection agency.  However, it further stated Medicare's belief that an intermediary could reasonably have interpreted the title of PRM §310.2, Presumption of Noncollectibility, to provide that an uncollectible account could be presumed to be a bad debt if the provider had made a reasonable and customary attempt to collect the bill for at least 120 days, even though the claim had been referred to a collection agency.  Therefore, the memorandum provided that where an intermediary, prior to August 1, 1987, applied §310.2 to permit an allowable Medicare bad debt for an account sent to a collection agency, consistent with the provider's collection procedures for non-Medicare patients, the moratorium prohibited the intermediary from applying the policy differently despite the Health Care Financing Administration (now, the Centers for Medicare & Medicaid Services) directives to the contrary dated subsequent to August 1, 1987.

Medicare believed it was required by the moratorium to take the above position, and for intermediaries which had not permitted bad debts before August 1, 1987, it expected those intermediaries to continue to follow Medicare's policy of not allowing the bad debts.  Therefore, when intermediaries change and the first intermediary, prior to August 1, 1987, allowed a hospital's bad debts for accounts sent to a collection agency, Medicare, based on the moratorium, permits that intermediary to continue to allow the bad debts.  However, if the new intermediary's position is to disallow the hospital's bad debts for accounts sent to a collection agency consistent with Medicare policy, Medicare expects it to disallow the bad debts after it becomes the hospital's intermediary.

Accordingly, in this case, Medicare expects United Government Services, the Provider's intermediary since 1999, to disallow the Provider's bad debts for accounts sent to a collection agency until the collection agency has completed its collection effort and returned the uncollected accounts to the provider.

[2] We refer to section 4008(c) of the Omnibus Budget Reconciliation Act (OBRA) of 1987, as amended by section 8402 of the Technical and Miscellaneous Revenue Act of 1988 and section 6023 of OBRA of 1989 as the "hospital bad debt moratorium."

4

In conclusion, the Chronic Care Policy Group believes that the bad debts claimed by the Provider were still active accounts held by the collection agency and, as such, could not properly be deemed worthless or uncollectible. Therefore, they were not eligible to be claimed as reimbursable Medicare bad debts. For this reason, it recommends reversal of the Board's decision.

Sincerely,

Laurence D. Wilson