UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

DAMERON HOSPITAL ASSOCIATION,
a non-profit California
corporation,

         NO. CIV. S-06-1360 FCD/KJM

      Plaintiff,

   v.                  <u>MEMORANDUM AND ORDER</u>

MICHAEL O. LEAVITT, Secretary
of the Department of Health
and Human Services and the
Centers for Medicare and
Medicaid Services,

      Defendant.

----oo0oo----

This matter is before the court on plaintiff Dameron

Hospital Association's ("plaintiff") appeal, pursuant to 42

U.S.C. § 1395oo(f)(1), of the final decision of defendant Michael

O. Leavitt, Secretary of Health and Human Services ("defendant"

or the "Secretary"), disallowing plaintiff's claim for Medicare

reimbursement of uncollected Medicare patient deductible and

///

///

1

co-insurance obligations for its 1999 cost year.[1]  In said final decision, defendant[2] reversed "PRRB Decision 2006-D16," wherein the Provider Reimbursement Review Board, Department of Health and Human Services ("PRRB") overruled the findings of the Medicare Intermediary[3] that denied plaintiff's claim for reimbursement of 142 "bad debt"[4] accounts, totaling $38,000.00.[5]

The PRRB found, contrary to the Intermediary, that all audited accounts were "actually uncollectible" and "worthless" within the meaning of Code of Federal Regulations § 413.89(e) and thus, reimbursable as bad debt accounts; in so ruling, the Board held: (1) that the "presumption of collectibility" arising from the "active" status of a bad debt account at an outside collection agency is not conclusive, as the presumption may be rebutted by evidence that the account is "actually uncollectible"

---

[1]    Because the court finds that oral argument will not be of material assistance, the court orders this matter submitted on the briefs.  E.D. Cal. L.R. 78-230(h).

[2]    The specific actor authorized by statute to review and overturn decisions by the PRRB is the CMS Administrator (the Administrator of the Department of Health and Human Services Centers for Medicare and Medicaid Services ["CMS"]).  42 U.S.C. § 1395oo(F).

[3]    A Medicare Intermediary is an agent hired by CMS to audit annual cost reports submitted by Medicare providers in support of their claim for reimbursement for healthcare services provided to Medicare beneficiaries.  The Intermediary in this case is United Government Services, LLC, a subsidiary of the Blue Cross and Blue Shield Association of Independent Blue Cross and Blue Shield Plans, Chicago, Illinois.

[4]    As explained below, reimbursable Medicare bad debt results from beneficiaries' non-payment of Medicare deductibles and co-insurance.

[5]    Compl., filed June 19, 2006, ¶ 8 (describing the amount in controversy as $38,000.00, which is derived by multiplying the total bad debt amount of $64,220 by 0.60, which is the bad debt reduction factor applicable to 1999).

and "worthless" despite its status at a collection agency; and
(2) plaintiff's policy of writing off active collection accounts
as Medicare bad debt was accepted by the Intermediary prior to
August 1, 1987, and thus, under Section 6023 of the Omnibus
Budget Reconciliation Act of 1989 (commonly referred to as the
"Bad Debt Moratorium") (OBRA, 1989, Pub.L. No. 101-239 (Dec. 19,
1989), 42 U.S.C. § 1395f note) (hereinafter, "OBRA" or the
"moratorium"), defendant is statutorily barred from denying
plaintiff's reimbursement claim.

Defendant's decision overturned both of these critical
findings, resulting in the ultimate denial of plaintiff's
reimbursement claim.  Defendant found that (1) no amount of
evidence can overcome the presumption of collectibility that
arises from the active status of a bad debt account at an outside
collection agency and (2) the statements of plaintiff's Chief
Financial Officer ("CFO") did not prove by a preponderance of the
evidence that the Medicare Intermediary had timely accepted
plaintiff's practice of writing off bad debt while it was still
in collection at an outside agency, and thus, OBRA was not a
statutory bar to the denial of reimbursement in this case.

On this latter issue, the court finds defendant's decision
"contrary to law," because plaintiff met its burden of proof to
demonstrate OBRA's applicability, and thus, this court must
reverse defendant's decision pursuant to the Administrative
Procedures Act.  As this court finds a statutory bar to the
denial of plaintiff's reimbursement claim, it does not reach
defendant's alternative basis for denial of plaintiff's claim
(namely, that the debts' "active" status at an outside collection

3

agency alone precludes a finding of uncollectibility).  For the
reasons set forth below, the court reverses in part defendant's
final decision and directs therefore that defendant reimburse
plaintiff's 1999 Medicare bad-debt submission in full.

## BACKGROUND

The Medicare Act establishes a system for payment of health
services provided to the elderly and disabled.  42 U.S.C. § 1395
*et seq.*  CMS administers the program for the Secretary.
Plaintiff is a hospital located in Stockton, California and is a
participating Medicare provider.  Pursuant to 42 U.S.C. § 1395h,
fiscal intermediaries under contract to the Secretary serve as
claims managers for the Medicare program, making the initial
determination of the amount of payment to be made to a health
care provider.  At the close of the fiscal year (the cost
reporting period), a provider submits a cost report to its fiscal
intermediary showing the costs it incurred during the fiscal year
and the proportion of the costs to be allocated to Medicare.  42
C.F.R. § 413.20.  The fiscal intermediary audits the report and
determines the final amount of Medicare reimbursement due to the
provider, 42 U.S.C. § 1395g, and then issues a Notice of Program
Reimbursement ("NPR"), 42 C.F.R. § 405.1803.  A provider that is
dissatisfied with the intermediary's determination, as set forth
in the NPR, is entitled to a hearing before the PRRB and,
following discretionary review by the Secretary of the PRRB's
decision, may seek judicial review of the Secretary's final
decision.  42 U.S.C. § 1395oo(f).

Among other costs, Medicare reimburses providers for bad
debts that are attributable to amounts unpaid by beneficiaries of

4

the Medicare program for Medicare deductibles and co-insurance.

42 C.F.R. § 413.89(a).  In this case, the NPR for Financial Year

Ending ("FYE") 1999 was issued by the Intermediary on July 22,

2003.  Therein, the Intermediary disallowed plaintiff's claimed

Medicare bad debts based on an audit of 58 of the 142 accounts

submitted for reimbursement.

Bad debts are defined at 42 C.F.R. § 413.89(b)(1) as

follows:

> [A]mounts considered to be uncollectible from accounts
> and notes receivable that were created or acquired in
> providing services. 'Accounts receivable' and 'notes
> receivable' are designations for claims arising from
> the furnishing of services, and are collectible in the
> relatively near future.

While the regulation states that payment for deductibles and

coinsurance amounts are the responsibility of the beneficiaries,

it also recognizes that the inability of providers to collect

said amounts could result in part of the costs of Medicare

covered services being borne by individuals who are not

beneficiaries (such as providers like plaintiff).  42 C.F.R. §

413.89(d).  Thus, to prevent such cross-subsidization, Medicare

reimburses providers for allowable bad debts.  Although, to

prevent windfalls for hospitals that might otherwise have strong

incentives to simply "write off" unpaid Medicare obligations as

bad debts rather than pursue collection of the amounts, the

Secretary's regulation establishes several criteria that an

unpaid Medicare obligation must meet to be allowed as "bad debt."

The criteria are:

> (1)    The debt must be related to covered services and
>        derived from deductible and coinsurance amounts;

1
  (2) The provider must establish that reasonable collection
     efforts were made;

2
  (3) The debt was actually uncollectible when claimed as
     worthless; and

3
  (4) Sound business judgment established that there was no
     likelihood of recovery at any time in the future.

4

5
42 C.F.R. § 413.89(e).

6
   CSM publishes the Provider Reimbursement Manual ("PRM"),

7
which contains interpretative guidelines and policies to

8
implement the Medicare regulations.  Relevant to this case, the

9
PRM provides:

10
   To be considered a reasonable collection effort, a
   Provider's effort to collect Medicare deductible and

11
   coinsurance amounts must be similar to the effort
   the Provider puts forth to collect comparable amounts

12
   from non-Medicare patients.

13
PRM § 310 (Administrative Record ["AR"], filed Nov. 28, 2006,

14
220).  A provider's collection effort may include "the use of a

15
collection agency in addition to or in lieu of subsequent

16
billings, follow-up letters, telephone and personal contacts . .

17
. ."  Id. at § 310(A).

18
   If after reasonable and customary attempts to collect a
   bill, the debt remains unpaid more than 120 days from

19
   the date the first bill is mailed to the beneficiary,
   the debt may be deemed uncollectible.

20

21
Id. at § 310.2 (AR 221).  This provision is known as the

22
"presumption of uncollectibility."

23
   The Secretary's Medicare Intermediary Manual ("MIM") also

24
explains and clarifies the application of the reimbursement

25
regulations.  Relevant to this action, the MIM provides:

26
   If the bad debt is written-off on the provider's books
   121 days after the date of the bill and then turned over

27
   to a collection agency, the amount cannot be claimed as
   a Medicare bad debt on the date of the write-off.  It can

28

> be claimed as a Medicare bad debt only after the collection
> agency completes its collection effort.

MIM, Part 1B, § 13-2 (AR 33).  This provision is known as the

"presumption of collectibility."

Finally, the Department of Health and Human Services issued

a policy memorandum, dated June 11, 1990, to further clarify the

bad debt policy.  It states:

> [U]ntil a provider's reasonable collection has been
> completed, including both in-house efforts and the
> use of a collection agency, a Medicare bad debt may not
> be reimbursed as uncollectible.  This is in accord with
> the fourth criterion in section 308 which provides that
> an uncollected Medicare account cannot be considered an
> allowable Medicare bad debt unless sound business judgment
> established that there is no likelihood of recovery at any
> time in the future.  We have always believed that, clearly,
> there is a likelihood of recovery for an account sent to
> a collection agency and that claiming a Medicare bad debt
> at the point of sending the account to the agency would
> be contrary to the bad debt policy in section 308 and 310.

(AR 32-33.)

Here, relying on the "presumption of collectibility" and the

corollary guidelines, the Intermediary disallowed plaintiff's bad

debt reimbursement claim for 1999, finding that plaintiff had not

demonstrated the debts were "actually uncollectible" when claimed

as worthless or that "sound business judgment" established that

there was no likelihood of recovery in the future.  Prior to

claiming the debts, plaintiff engaged in an internal collection

effort, which was variable in the length of time, and then turned

the accounts over to a collection agency.[6]  After some number of

_____

[6]    Plaintiff's in-house collection department applies and
documents collection efforts on Medicare accounts sufficient to
establish that an account is actually uncollectible and worthless
before plaintiff writes off the account as bad debt.  (AR 99-102,
103-05, 840-975, 864-868, 1053-1294.)  Per an agreement with an
outside collection agency that receives all of plaintiff's

days, typically 30 to 60 days, had passed from the date the accounts were turned over to the collection agency, plaintiff considered the uncollected debt to reimbursable for Medicare cost reporting purposes.[7]  Critical to the Intermediary's decision to deny the claim was that plaintiff claimed as "bad debts," debts that were at least 120 days old at the close of the fiscal year but were pending, or in "active" status, with an outside collection agency (said debts had not been returned by the agency to plaintiff as uncollectible).  Of the Intermediary's random sample of 58 accounts, 30 of those accounts were assigned to a collection agency that determined the accounts to be uncollectible in 2003.  (AR 1447-48.)  Yet, plaintiff wrote the debts off as bad debt, *i.e.*, claimed the bad debts on its cost report for 1999, regardless of whether the collection agency had

---

worthless collection accounts, plaintiff forwards uncollectible Medicare and non-Medicare accounts to the collection agency, as Medicare regulations require that plaintiff treat Medicare-bad debts the same as non-Medicare bad debts.  (AR 229.)  The collection agency then works the worthless Medicare accounts in the same manner as all other accounts.

Plaintiff explains that by requiring its outside collection agency to work worthless Medicare accounts, plaintiff tests its "business judgment" regularly to confirm that it is "sound."  (AR 102, 107.)  In this case, plaintiff asserts the collection agency's efforts prove that its judgment was sound as no money has been collected on any of the 58 audited accounts, despite the efforts by the collection agency.  (AR 102, 104-05, 122.)  Also, plaintiff asserts that by deferring bad debt write-offs during early outside collection efforts, it keeps worthless accounts positioned for unforseen "direct response" by the beneficiary.  When that is not forthcoming, the account is written off to bad debt.  (AR 122.)

[7]    In this case each audited account was worked in excess of 120 days prior to write-off (the accounts ranged from 134 days from opening to write-off to 1793 days from opening to write-off).  (AR 864-868.)

8

completed its collection efforts on the accounts.  The
Intermediary concluded that plaintiff had no documentation to
support that it determined that each Medicare bad debt was
actually worthless as of any specified date.  (AR 1026.)  As
such, the Intermediary found that plaintiff could not claim any
debt as bad debt until collection activities had ceased by the
agency and the account returned to plaintiff as uncollectible.
For these reasons, among others not pertinent herein, the
Intermediary denied plaintiff's bad debt reimbursement claim.

     Plaintiff appealed the disallowance to the PRRB, who
reversed the decision of the Intermediary, holding that the mere
"active" status of an account with an outside collection agency,
while suggestive of collectibility of that account, is not in and
of itself proof of value or collectibility.  The Board found that
neither the presumption of uncollectibility in the PRM nor the
presumption of collectibility of collection agency accounts in
the MIM are conclusive presumptions.  Ultimately, the four
criteria of Section 413.89(e) must control, and thus, the
presumption of collectibility arising from an account's status at
a collection agency may be rebutted by evidence that the account
is "actually uncollectible" and "worthless."  The Board also
found that the Intermediary's present rejection of plaintiff's
bad debt policy, after having accepted it in prior years, was
statutorily barred, pursuant to OBRA.[8]  (AR 44-55.)

---

     [8]    The affidavit of plaintiff's CFO and the testimony at
the hearing established that: (1) prior to August 1, 1987,
plaintiff wrote off Medicare accounts as bad debt at or about the
time that they were assigned to an outside collection agency; and
(2) until the NPR for FYE 1999 was published in July 2003, the
Intermediary had always accepted this collection practice; the

The Secretary, exercising his discretionary review, overturned the PRRB's decision. (AR 2-12.) The Secretary found that no amount of evidence could overcome the presumption of collectibility arising from the active status of a bad debt account at an outside collection agency because where a provider continues to attempt to collect a debt via a collection agency, it is reasonable to assume that the provider still considers the debt to have value. According to the Secretary, to permit a provider to deem a debt uncollectible after 120 days for Medicare reimbursement purposes, but to continue its efforts to collect the debt via an outside collection agency would be inconsistent with the requirements that the debt was actually uncollectible and there was no likelihood of future collection. Such an interpretation, the Secretary found, would impermissibly transform the four-requirements of Section 413.89(e) into two requirements: (1) The debt must be related to covered services and derived from deductible and co-insurance amounts; and (2) the provider must be able to establish that reasonable collection efforts were made for 120 days. The Secretary further found that there was no statutory bar to the Intermediary's present rejection of plaintiff's bad debt policy since the record failed to show that the Intermediary "accepted" plaintiff's policy within the meaning of OBRA. (<u>Id.</u>)

////

////

_____

July 2003 NPR was the first time the Intermediary had rejected a bad debt submission solely because an account was listed as active at an outside collection agency. (AR 102-103, 175-184, 1300-1301.)

**STANDARD**

Judicial review of the Secretary's final decision in a Medicare reimbursement dispute is conducted in accordance with the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* 42 U.S.C. § 1395oo(f)(1).  Under this standard, the court may set aside a final decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or is "unsupported by substantial evidence."  5 U.S.C. § 706(2)(A), (E); Cmty Hosp. of the Monterey Peninsula, 323 F.3d 782, 792 (9th Cir. 2003).  The United States Supreme Court defined the "arbitrary and capricious" standard under Section 706 as follows:

> The scope of review is a narrow one.  A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency . . . The agency must articulate a rational connection between the facts found and the choice made . . . While we may not supply a reasoned basis for the agency's action that the agency itself has not given . . . we will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.

Bowman Transp. v. Arkansas-Best, Freight Sys., 419 U.S. 281, 285-86 (1974) (citations omitted).

The court must defer to the agency's reading of its own regulations, unless the reading is "plainly erroneous or inconsistent with the regulation[s]."  Auer v. Robbins, 519 U.S. 452, 461 (1997); K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 292 (1988) ("If the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute.")  Thus,

if the Secretary defines a regulation in a reasonable way, the court must give the reading controlling weight, even if it is not the answer, "'the court would have reached if the question had initially arisen in a judicial proceedings.'" Regions Hosp. V. Shalala, 522 U.S. 448, 457 (1998) (quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 n. 11 (1984)).

**ANALYSIS**

Plaintiff contends that the Secretary's decision, finding that plaintiff had not sustained its burden to demonstrate the applicability of OBRA's moratorium, is contrary to law and thus, subject to reversal under the APA's "arbitrary and capricious" standard. 5 U.S.C. § 706. In OBRA, Congress provided:

> The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigence, determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

Thus, this "moratorium prohibits the Secretary from imposing new or different bad debt criteria on a provider after August 1, 1987, if the intermediary had 'accepted' the provider's policies before that date in accordance with the rules then in effect." University Health Servs., Inc. v. Health & Human Servs., 120 F.3d 1145, 1151 (11th Cir. 1997).

In this case, the parties dispute only whether there was "acceptance" of plaintiff's bad debt write-off policy prior to August 1, 1987. The parties do not dispute that any such acceptance was in "accordance with the rules then in effect."

12

Id.  As set forth above, it was plaintiff's policy during 1999 to write off accounts as bad debt shortly after referral of the accounts to an outside collection agency; the referral was made only after plaintiff's internal collection department had worked the accounts and determined them to be uncollectible; written-off accounts, pending with the collection agency, were at least 120 days old.  Plaintiff borne the burden to demonstrate, by a preponderance of the evidence, that its policy prior to August 1, 1987 was the same and that the Intermediary had accepted said policy.  See Hennepin County Med. Ctr. v. Shalala, 81 F.3d 743 (8th Cir. 1996).

In that regard, plaintiff offered at the PRRB hearing, the statement (titled a "certification of facts") of its CFO, Cyrus Dah, provided to the Intermediary in 2003, who declared: (1) that he has been employed by plaintiff since 1983; and (2) during said time through August 2003, it was plaintiff's policy to write off Medicare accounts as bad debt at or about the time the accounts were assigned to an outside collection agency.[9]  (AR 1301.)[10] Plaintiff also established at the PRRB hearing, via documentary evidence and the testimony of its in-house Credit and Collections Department Manager, that the Intermediary has audited plaintiff's

[9]    These debts were at least 120 days old; plaintiff's internal collection department had worked the accounts and determined the debts were uncollectible and worthless but the debts were turned over to an outside collection agency, with plaintiff's other uncollectible, non-Medicare accounts, as a matter of course.

[10]    As set forth below, the Intermediary did not challenge the admissibility of Dah's statement at the PRRB hearing and defendant does not do so herein; rather, the Intermediary argued then and defendant argues now only that said statement and the other evidence proffered by plaintiff is insufficient.

13

bad debts accounts annually, and until the FYE 1999 audit in 2003, the Intermediary never objected.  In other words, the FYE 1999 audit was the first time the Intermediary rejected plaintiff's bad debt submissions because accounts remained "active" with an outside agency.  (AR 53-55 [citing hearing transcript], 142-144, 871-884.)

The Intermediary provided *no* evidence in rebuttal.  Nor did the Intermediary challenge the reliability or admissibility of CFO Dah's testimony.  Instead, the Intermediary simply argued that plaintiff's documentation was insufficient proof of its pre-August 1987 acceptance of plaintiff's bad debt collection write-off policy.  The Intermediary asserted that plaintiff must produce the Intermediary's pre-1988 audits to prove that it accepted plaintiff's pre-August 1, 1987 policy of writing off accounts as bad debt at or about the time the debts were assigned to an outside collection agency.  Contrary to the PRRB, the Secretary, in his final decision, found the Intermediary's argument persuasive.

The Secretary's decision is "not in accordance with the law" and therefore this court must reverse the decision pursuant to the APA.  The Secretary does not cite (nor did the Intermediary) any law or regulation requiring a provider to retain the Intermediary's audit reports or NPRs for prior years, particularly such reports from some 15 years prior, or that such reports are the only acceptable documentation of the Intermediary's acceptance of pre-August 1987 collection policies.  "The term 'acceptance' is not defined [in OBRA] and the statute includes no specific requirements for acceptance."  Harris County

14

Hospital Dist. v. Shalala, 64 F.3d 220, 222 (5th Cir. 1995).

However, courts have recognized that an Intermediary's "previous

repayment of a provider's claim for Medicare reimbursement of bad

debt following an investigation and audit constitutes

'acceptance' for purposes of triggering the moratorium."

University Health Servs., 120 F.3d at 1152; accord Harris County

Hospital District, 64 F.3d at 220; see also Hennepin County Med.

Ctr., 81 F.3d at 749 (recognizing that in the majority of cases,

allowance of a bad debt claim, via issuance of the NPR and the

repayment that flows from it, functions as proof of acceptance of

the provider's bad debt practices).

     Here, plaintiff offered *unrefuted* evidence that its bad debt

collection policy in place in 1999 was the same as the policy in

place prior to August 1987, and that only until 2003, during the

audit of the FYE 1999, did the Intermediary reject plaintiff's

bad debt submissions.  Indeed, CFO Dah's certification of facts

was presented to the Intermediary in August 2003, some 20 months

before the PRRB hearing.  Yet, the Intermediary, despite apparent

access to pertinent files, failed to offer *any* evidence to rebut

plaintiff's showing.  (AR 142-144.)  Where "an intermediary's

allowance of a claim remains unchallenged and undisturbed [as is

the evidence in this case for years prior to August 1987 up to

1999] . . . [the allowance(s)] serves as the functional

equivalent of acceptance of the provider's claim [or policies] in

those cases."  University Health Servs., 120 F.3d at 1153; see

also Hennepin County Med. Ctr., 81 F.3d at 749 ("A notice of

program reimbursement, and the reimbursement that flows from it,

are the only tangible forms of acceptance a provider can expect

from an intermediary.").

In sum, as the *only* evidence proffered on the issue, plaintiff's evidence, specifically, its CFO's statement and the testimony and documents offered into evidence at the PRRB hearing, preponderates.  The "preponderance of the evidence" standard requires that the trier of fact decide whether the existence of a fact is more probable than its nonexistence.  Concrete Pipes & Prods. of Cal., Inc. v. Construction Laborers Pen. Turst for So. Cal., 508 U.S. 602, 622 (1993).  Here, only one party, plaintiff, produced evidence regarding application of the moratorium, and neither the Intermediary nor defendant objected to the evidence as either unreliable or inadmissible.  Under the above case law, plaintiff's evidence is plainly sufficient to establish entitlement to the moratorium's protections.  The court therefore finds that the Secretary's decision finding that plaintiff had not met its burden of proof on the issue contrary to law as the decision violated OBRA.  See Harris County Hospital Dist., 64 F.3d at 222 (affirming the district court's decision that the "Secretary's action was contrary to law because it violated the OBRA").

Because violation of OBRA provides a sufficient basis for reversing the Secretary's decision and ordering payment of plaintiff's FYE 1999 bad debt submission in full, the court does not consider the Secretary's alternative finding that reimbursement is impermissible based on the debts' "active" status, at the time, at an outside collection agency.  Id. at 222-23 (holding that the court need not address the issue of whether the provider complied with all Medicare regulations

16

because violation of OBRA provides a sufficient basis to affirm the district court's judgment in favor of the provider).  As the court finds that OBRA provides a statutory bar to the denial of plaintiff's subject reimbursement claim, it is irrelevant whether plaintiff otherwise complied with the applicable bad debt collection regulations in seeking reimbursement for the FYE 1999.

**CONCLUSION**

For the foregoing reasons, the court reverses the final decision of the Secretary and directs that the Secretary reimburse plaintiff's FYE 1999 Medicare bad debt submission in full.

IT IS SO ORDERED.

DATED: August 8, 2007

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE

17